UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| In re:<br><br>Keys Medical Staffing LLC,<br><br>            Debtor. | Case No. 22-20573-JRS<br>(Subchapter V)<br><br>Chapter 11 |
| Keys Medical Staffing LLC, and ARA, Inc.,<br><br>            Plaintiffs,<br><br>v.<br><br>SavaSeniorCare, LLC, SSC Equity Holdings, LLC, SSC Carolina Equity Holdings, LLC, SSC Equity Holdings MT LLC, SavaSeniorCare Administrative and Consulting, LLC, SSC Atlanta Operating Company LLC, Marietta Operating Company LLC, Rome Operating Company LLC, SSC Canton Operating Company LLC, and SSC Austell Operating Company LLC,<br><br>            Defendants. | ADV. PROC. NO.<br>_____ |

## COMPLAINT

Plaintiffs, Keys Medical Staffing, LLC ("Keys") and ARA, Inc. ("ARA") hereby file this Complaint and in support thereof, respectfully show this Court as follows:

1

**PARTIES**

1. Plaintiff Keys Medical Staffing LLC is an Illinois corporation with its principal office at 770 N. Halstad St., Suite 100, Chicago, IL 60642. Keys is a provider of temporary employment staffing services in the medical field.

2. Plaintiff ARA, Inc. is a Minnesota corporation with its principal office at 3140 Neil Armstrong Boulevard, Suite 203, Eagan, MN 55121. ARA performs invoice factoring and payroll processing services for companies in the temporary employment staffing industry.

3. Defendant SavaSeniorCare, LLC is a Delaware business with its principal office at 8601 Dunwoody Place, Suite 775, Sandy Springs, GA 30350. Through its agents and alter-ego entities, SavaSeniorCare, LLC provides skilled nursing and numerous other services for elderly patients.

4. Defendant SavaSeniorCare Administrative and Consulting LLC is a Delaware business with its principal office at 8601 Dunwoody Place, Suite 775, Sandy Springs, GA 30350. Through its agents and alter-ego entities, SavaSeniorCare Administrative and Consulting LLC provides skilled nursing and numerous other services for elderly patients.

5. Defendant SSC Equity Holdings, LLC is a Delaware business with its principal office at One Ravinia Drive, Suite 1400, Atlanta, GA 30346. Through its agents and alter-ego entities, SSC Equity Holdings, LLC provides skilled nursing and numerous other services for elderly patients.

6. Defendant SSC Carolina Equity Holdings, LLC is a Delaware business with an unlisted principal office address. Its registered agent address is 1209 Orange Street,

2

Wilmington, DE 19801. Through its agents and alter-ego entities, SSC Carolina Equity Holdings, LLC provides skilled nursing and numerous other services for elderly patients.

7.  Defendant SSC Equity Holdings MT LLC is a Maryland business with its principal office address at 8601 Dunwoody Place, Suite 775, Sandy Springs, GA 30350. Through its agents and alter-ego entities, SSC Equity Holdings MT LLC provides skilled nursing and numerous other services for elderly patients.[1]

8.  Defendant SSC Atlanta Operating Company LLC is a Delaware business with its principal office at 1500 S. Johnson Ferry Road NE, Atlanta, GA 30319. It is a nursing home facility doing business as "Sandy Springs Health and Rehabilitation Center" as well as "Sandy Springs Center for Nursing and Healing."

9.  Defendant Marietta Operating Company LLC is Delaware business with its principal record address at One Ravinia Drive, Suite 1500, Atlanta, GA 30346. It is a nursing home facility doing business as "Roselane Health and Rehabilitation Center" as well as "Roselane Health Center by Harborview."

10.  Defendant Rome Operating Company LLC is a Delaware business with its principal record address at One Ravinia Drive, Suite 1500, Atlanta, GA 30346. It is a nursing home facility doing business as "Rome Health and Rehabilitation Center" as well as "Harborview Rome."

---

[1] Defendants SavaSeniorCare, LLC, SavaSeniorCare Administrative and Consulting LLC, SSC Equity Holdings, LLC, SSC Carolina Equity Holdings, LLC, and SSC Equity Holdings MT LLC are collectively referred to herein as "Sava."

11. SSC Canton Operating Company LLC is a Delaware business with its principal office address at 150 Hospital Circle, Canton, GA 30114. It is a nursing home facility doing business as "Brian Center Health & Rehabilitation/Canton" as well as "Cherokee Center for Nursing and Healing."

12. SSC Austell Operating Company LLC is a Delaware business with its principal office address at 8601 Dunwoody Place, Suite 775, Sandy Springs, GA 30350. It is a nursing home facility doing business as "Anderson Mill Health and Rehabilitation Center" as well as "Anderson Mill Center for Nursing and Healing."[2]

## JURISDICTION AND VENUE

13. On June 28, 2022 (the "Filing Date") Plaintiff Keys filed its voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code. [Doc. 1]. In accordance with Section 1184 of the Bankruptcy Code, Keys continues to operate its business as a Debtor in possession.

14. This is a Subchapter V case and therefore there is no creditors' committee. Leon S. Jones has been appointed the Subchapter V Trustee.

15. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409 as this is a matter arising in the Plaintiff's Chapter 11 Bankruptcy Case. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[2] SSC Atlanta Operating Company LLC, Marietta Operating Company LLC, Rome Operating Company LLC, SSC Canton Operating Company LLC, and SSC Austell Operating Company LLC are collectively referred to herein as the "Alter-Ego Companies."

16. The statutory predicates for the relief requested herein are §§ 105(a), 542, 544, 550, 704, 1106 and 1184 of the Bankruptcy Code.

17. Plaintiff Keys as the Debtor in Possession has the rights, powers, and duties of a trustee. 11 U.S.C. §§ 1184, 1106 and 704.

## FACTUAL ALLEGATIONS

### The Relationship Between Sava and the Alter-Ego Companies

18. Sava is an alter-ego of, is in a joint venture with, and/or has a principal/agent relationship with, the Alter-Ego Companies based on what appears to be and includes commingling of assets, a failure to observe corporate formalities, and undercapitalization.

19. The ownership structure of Sava, and the complex, intertwined relationships between Sava and its operating nursing home companies has been explored and documented in substantial past litigation, including a 2015 consolidated complaint filed against SavaSeniorCare LLC and its related entities by the United States Department of Justice, wherein Sava agreed to pay $11.2 million to resolve False Claim Act allegations that its skilled nursing facilities—facilities similar to the Alter-Ego Companies in this litigation—were billing the Medicare program for rehabilitation therapy services that were not reasonable, necessary or skilled, and to resolve allegations that various Sava billed the Medicare and Medicaid programs for grossly substandard skilled nursing services. A true and correct copy of the settlement agreement in that case is attached hereto as **Exhibit A**.

20. The Department of Justice's consolidated complaint against Sava in the 2015 litigation alleges that "Sava is organized in a pyramidal corporate structure." A true and

5

correct copy of the consolidated complaint filed by the Department of Justice against Sava is attached hereto as **Exhibit B**.

21. In each case where Sava wishes to establish a nursing home facility, Sava creates a local entity to operate the nursing home (e.g., each of the Alter-Ego Companies). However, the local entity does not own the real estate used for the nursing home, is severely undercapitalized, and does not have its own assets or insurance to pay claims.

22. This structuring of the Alter-Ego Companies serves no valid business purpose other than to obfuscate, avoid liability, and obscure ownership structure. The primary goal is for the Alter-Ego Companies to funnel as much money as possible to Sava. This is accomplished through various management agreements, financial service agreements, a revolving credit agreement, lease agreements, ancillary services contracts, and rental payments.

23. The Alter-Ego Companies have no website of their own. Rather, they are included on a list of facilities on www.savaseniorcare.com/find-a-center.html. Defendants bank on the branding and recognition of the "Sava" name to draw residents into their facilities, presenting the image of a unified nationwide operation through brochures, marketing materials, their website, communications with the media, and other publications.

24. The Medicare.gov website lists SavaSeniorCare LLC and SSC Equity Holdings MT LLC as each having a 5% or greater indirect ownership interest in the "Sandy Springs Center for Nursing and Healing," and lists Christopher Stenger as having "Operational/Managerial Control" of the facility. A true and correct copy of the ownership entry is attached hereto as **Exhibit C**.

25. In a previous deposition, Christopher Stenger, the vice president of planning and reimbursement for SavaSeniorCare Administrative Services, LLC, stated that "there are 183 operating companies that are affiliated with Sava Senior Care, and if you aggregate all 183, I think that puts us at about fifth or sixth in the industry for largest operator." Mr. Stenger further stated, "[F]rom a consolidated perspective, those 183 operating companies get consolidated together, and I speak primarily from an accounting perspective, but the results of those 183 operating companies will get consolidated together and will get reported out as one number."

26. The Medicare.gov website lists SavaSeniorCare LLC as having a 5% or greater indirect ownership interest in the "Roselane Health Center by Harborview," and lists Christopher Stenger as having "Operational/Managerial Control" of the facility. A true and correct copy of the ownership entry is attached hereto as **Exhibit D**.

27. The Medicare.gov website lists SavaSeniorCare LLC as having a 5% or greater indirect ownership interest in "Harborview Rome," and lists Christopher Stenger as having "Operational/Managerial Control" of the facility. SSC Equity Holdings LLC is listed as having a 5% or greater direct ownership interest. A true and correct copy of the ownership entry is attached hereto as **Exhibit E**.

28. The Medicare.gov website lists SSC Carolina Equity Holdings, LLC as having a 5% or greater indirect ownership interest in "Cherokee Center for Nursing and Healing," and lists Christopher Stenger as having "Operational/Managerial Control" of the facility. SavaSeniorCare LLC is listed as having a 5% or greater direct ownership interest. A true and correct copy of the ownership entry is attached hereto as **Exhibit F**.

29. The Medicare.gov website lists SSC Carolina Equity Holdings, LLC as having a 5% or greater indirect ownership interest in "Anderson Mill Center for Nursing and Healing," and lists Christopher Stenger as having "Operational/Managerial Control" of the facility. SavaSeniorCare LLC is listed as having a 5% or greater direct ownership interest. A true and correct copy of the ownership entry is attached hereto as **Exhibit G.**

30. Wynn Sims is listed as an officer of each of the Alter-Ego Companies on the Medicare website entries. In a previous deposition, Ms. Sims testified that she is the Senior Paralegal for SavaSeniorCare Administrative Services, LLC.

31. Defendants are treated as a unified entity which consolidates expenses and commingles funds. Funds are swept from each of the Sava and Alter-Ego Companies' operating accounts and sent to a concentration account maintained by another Sava affiliate, SSC Disbursement Company, which applies the funds/receivables in the account to a revolving credit agreement taken out by SavaSeniorCare, LLC.

32. The local nursing facility's receivables operate as the collateral and guarantee for SavaSeniorCare, LLC's obligation under its revolving credit agreement.

33. SSC Equity Holdings, LLC holds the Medicare and Medicaid provider number for all nursing facility operators.

34. Sava and the Alter-Ego Companies share accountants, attorneys, officers, directors, and employees.

35. Sava has the authority to control the day-to-day management and operation of the Alter-Ego Companies.

36. In a previous deposition, Wynn Sims testified that she is the assistant corporate secretary of SavaSeniorCare, LLC, the corporate secretary of SavaSeniorCare Administrative Services, LLC, SSC Equity Holdings, LLC, and all of the Sava operating company LLCs. A true and correct copy of the relevant excerpt from Wynn Sims' deposition is hereto attached as **Exhibit H**.

37. Ms. Sims testified that she performs work for 240 different legal entities under the "Sava umbrella."

38. Ms. Sims testified that she is only compensated by SavaSeniorCare Administrative Services, LLC for the work reflected above.

<u>The Staffing Relationship between Keys, Sava, and the Alter-Ego Companies</u>

39. On or about June 2, 2020, ARA and Keys executed a "Conditional Letter of Agreement for Factoring and Payroll Services," inclusive of factoring terms and conditions, a security agreement pledging a security interest in substantially all of Keys' assets to ARA, a guaranty, and payroll services terms and conditions (the "**Factoring Agreement**").

40. Pursuant to the Factoring Agreement, and in accordance with Uniform Commercial Code ("UCC") § 9-101 *et seq.*, ARA filed a UCC financing statement against Keys with the Illinois Secretary of State on June 2, 2020. A true and correct copy of the filing is attached hereto as **Exhibit I**.

41. The financing statement, which remains an active and searchable public record today, names both the debtor and secured party and describes the covered collateral, which includes "all present and future accounts receivable, contract rights and other obligations

9

for payment of money" owing to Keys, including "all accounts and general intangibles" and "all proceeds of the foregoing." The filings therefore perfected ARA's security interest in Keys' assets. *See* UCC §§ 9-502, 9-509, 9-510; O.G.C.A §§ 11-9-502, 11-9-509, 11-9-510; 810 ILCS 5/9-502, 5/9-509, 5/9-510.

42. Throughout calendar year 2021, Keys executed contracts with the Alter-Ego Companies, whereby Keys agreed to provide temporary personnel services to Sava and the Alter-Ego Companies (collectively, or in reference to any one of them, the "Sava Staffing Agreements"). In exchange, the Alter-Ego Companies agreed to pay Keys for those services.

43. Paragraph 7 of each of the Sava Staffing Agreements states that invoices were required to be submitted by Keys within 60 days of the date services were rendered, and that the Alter-Ego Companies were responsible to pay all timely received invoices within 30 days of the submitted invoice.

44. The Sava Staffing Agreements are each fully integrated agreements by virtue of a merger clause contained in Paragraph 20.

45. There are no specific requirements for the content of invoicing issued by Keys under the Sava Staffing Agreements.

46. Paragraph 20 of each of the Sava Staffing Agreements states that each agreement cannot "be amended or modified except by a written instrument duly executed and signed by both parties." A true and correct copy of the Sava Staffing Agreements are attached hereto as **Exhibit J**.

47.	Promptly upon execution of the Sava Staffing Agreements, ARA issued an authenticated notice of assignment under the UCC. This authenticated notice of assignment put Defendants on notice of ARA's rights as a secured creditor of Keys, and obligated Defendants to make payment exclusively to ARA on Keys' receivables, including under § 9-406 and § 9-607 of the UCC.

48.	ARA and Keys began timely issuing invoicing under the Sava Staffing Agreements.

49.	However, as of July 16, 2021, Defendants began refusing to pay timely-issued invoicing under the Sava Staffing Agreements unless Keys complied with new, unilaterally imposed requirements set forth by Defendants in a letter of the same date. A true and correct copy of that letter, which was issued to Keys and ARA, is hereto attached as **Exhibit K** (the "July Letter").

50.	Neither Keys nor ARA consented to modified invoicing requirements of any kind.

51.	Neither Keys nor ARA executed and signed a written instrument which modified the invoicing requirements under the Sava Staffing Agreements.

52.	The requirements listed in the July Letter are obligations imposed <u>upon Defendants,</u> Sava, by the Centers for Medicare and Medicare Services (CMS). They are not obligations imposed upon Keys by CMS. In other words, the July Letter is an attempt by Defendants to shift their own CMS reporting obligations onto Keys without agreement by Keys. The CMS reporting obligations reflected in the July 16, 2021, letter are obligations that Defendants could fulfill for themselves through diligent recordkeeping of staffed employees working at their own facilities.

53.     Following issuance of the July Letter, Defendants began backing out and deleting timely-issued Keys' invoicing from its system. On October 4, 2021, Kristie A. Odom at Sava confirmed this fact, writing: "… the invoices are still being submitted without the required documentation. Please find attached an additional 2 invoices we have just received, invoices 41900981 and 41900992 **will not be processed for payment and are being deleted from our system** because they do not provide the required information."

54.     The "required documentation" referenced in Ms. Odom's email were the items listed by Defendants in the July Letter: items upon which Defendants were now improperly and unilaterally conditioning payment to Keys.

55.     Each invoice issued by Keys to Sava is a transaction founded in the placement of temporary employees to a Sava worksite, where labor is performed, and employees are due weekly payment by Keys as their employer.

56.     Staffing is a cash-flow negative business. Payroll is generally issued by a staffing company weeks or months before a customer pays the associated invoicing. To have a customer outright refuse to pay validly issued invoicing, where the payroll cost has already been borne by Keys, is a disastrous financial event, and one that can quickly throw a staffing company into peril as its payroll, leasing, insurance, and other bills become due.

57.     In an effort to avoid the prospect of bearing the entire cost of invoicing issued to Defendants, both Keys and ARA went to great lengths to try and bend to Defendants' improper invoicing demands.

58.     These efforts initially involved ARA attempting to revise its invoicing engine to accommodate the items listed in the July Letter. But when the revised invoices still did not

12

satisfy Defendants, Keys began reformatting ARA-issued invoicing outside of the system, to be subsequently sent to Defendants.

59. The process was time-intensive, manual, required Keys to hire an invoicing consultant at its own expense, and otherwise added to the crushing financial stress put upon Keys and ARA. Each week in which invoices were attempted to be reformatted was another week in which employees were placed at Defendants' business, payroll was due to those employees, and the amount owing by Defendants—which was advanced by Keys and ARA entirely out of pocket—grew larger and larger.

60. ARA and Keys, perhaps naively, believed that Defendants, collectively representing a large skilled nursing services provider, would eventually pay its legitimately owed debt, rightly compensating Keys and its employees who provided valuable and critical services.

61. Unfortunately, after months of work to satisfy Defendants, Defendants' crowning act of delay and abdicating responsibility was to reference the portion of the Sava Staffing Agreements which required invoicing to be issued within 60 days of the date services were rendered to deny Keys and ARA approximately $969,148.38 worth of invoicing.

62. Defendants manufactured an impermissible invoicing condition which, in addition to being a breach of contract, was impossible for ARA and Keys to timely meet.

63. The invoicing condition was not contemplated by the contract, was not permitted by the contract, and Defendants' denial of payment to Keys and ARA based on such condition should be proscribed.

64. As of today's date, $969,148.38 is due and owing by Defendants (**see Exhibit L**), which represents $969,148.38 in services actually received by Defendants, for which

Defendants have not paid (after giving Defendants credit for the $400,000 in payments made as part of the Keys Chapter 11 petition for bankruptcy).

## **COUNT I: BREACH OF CONTRACT**

65. ARA and Keys restate and reallege paragraphs 1 through 64 as if fully set forth herein.

66. Keys and the Alter-Ego Companies entered into the Sava Staffing Agreements, each of which were valid agreements supported by good and valuable consideration, whereby Keys agreed to provide temporary personnel services to the Alter-Ego Companies. In exchange, the Alter-Ego Companies agreed to pay Keys for those services.

67. ARA notified provided the Alter-Ego Companies with notice of Keys' assignment of its contractual right to receive payment under the Sava Staffing Agreements to ARA.

68. Since Keys assigned its right to receive payment to ARA, and since the Alter-Ego Companies received an authenticated notice of assignment from ARA respecting same, the Alter-Ego Companies were obligated to pay ARA. They did not do so.

69. Instead, the Alter-Ego Companies breached the Sava Staffing Agreements by unilaterally and impermissibly imposing invoicing requirements and failing to pay invoicing totaling $969,148.38. This represents the damages sustained by Keys and ARA for Alter-Ego Companies' breach of contract, which were proximately caused by, and occurred as a direct result of, such breach.

70. Because Sava is an alter-ego of, in a joint venture with, or has a principal/agent relationship with the Alter-Ego Companies, the breach by the Alter-Ego Companies, and

14

associated damages, are imputed to Sava, and Sava is legally responsible to Keys and ARA for same, along with the Alter-Ego Companies.

### COUNT II: UNJUST ENRICHMENT

71. ARA and Keys restate and reallege paragraphs 1 through 64 as if fully set forth herein.

72. Sava and Keys entered into the Sava Staffing Agreements, pursuant to which Sava was obligated to pay Keys' payment assignee, ARA, for temporary staffing services rendered by Keys.

73. Sava failed to remit $969,148.38 in payments for temporary staffing services provided by Keys to Sava.

74. By virtue of Sava's failure to pay Keys for the $969,148.38 in temporary staffing services, ARA and Keys have conferred a benefit upon Sava that constitutes unjust enrichment, and that in equity and good conscience should be repaid to Keys and ARA.

75. Because Sava is an alter-ego of, in a joint venture with, or has a principal/agent relationship with the Alter-Ego Companies, the unjust enrichment of the Alter-Ego Companies is imputed to Sava, and Sava is legally responsible to Keys and ARA for same, along with the Alter-Ego Companies.

### COUNT III:  TURNOVER

76. ARA and Keys restate and reallege paragraphs 1 through 61 as if fully set forth herein.

77. Sava is withholding property belonging to the Debtor in Possession, Keys.

78. Keys provided pre-petition services to Sava.

15

79. Keys incurred costs and expenses in providing services to Sava.

80. Keys is entitled to the turnover of the funds owed to it pursuant to its contract with Sava for the provision of those pre-petition services.

WHEREFORE, Plaintiffs Keys Medical Staffing LLC and ARA, Inc. pray for Judgment against Defendants, individually, collectively, and jointly-and-severally, as follows:

1. For an award of damages in the amount of $969,148.38, exclusive of interest and costs, the exact amount to be proven at trial.

2. For an award of pre- and post-judgment interest as allowed by law;

3. For costs, disbursements, and reasonable attorney's fees as allowed by law, including UCC §9-607(d), O.G.C.A § 11-9-607, 810 ILCS 5/9-607, and Paragraph 22 of each of the Sava Staffing Agreements; and

4. For such other and further relief that the Court may deem just and equitable.

    Respectfully submitted,

    ROUNTREE LEITMAN KLEIN & GEER, LLC

    /s/ Elizabeth A. Childers
    William A. Rountree, Ga. Bar No. 616503
    Will B. Geer, Ga. Bar No. 940943
    Elizabeth A. Childers, Ga. Bar No. 143546
    Century Plaza I
    2987 Clairmont Road, Suite 350
    Atlanta, Georgia 30329
    (404) 584-1238 Telephone
    wrountree@rlkglaw.com
    wgeer@rlkglaw.com
    echilders@rlkglaw.com
    Attorneys for Keys Medical Staffing, LLC
    Plaintiff

STEINFELD & STEINFELD, P.C.
/s/ Shayna M. Steinfeld
Shayna M. Steinfeld, Ga Bar 622895
11B Lenox Pointe, NE
Atlanta, GA 30324
404/636-7786
shayna@steinfeldlaw.com
Attorneys for ARA Inc, Plaintiff

17