IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* RITA HAYWARD, TRAMMEL KUKOYI, and TERRENCE SCOTT, | ) ) ) ) | CIVIL ACTION NUMBERS: 3:11-cv-0821 3:15-cv-0404 |
| Plaintiffs, | ) ) | 3:15-cv-1102 |
| v. | ) ) | CHIEF JUDGE SHARP MAGISTRATE JUDGE BRYANT |
| SAVASENIORCARE, LLC, SAVASENIORCARE CONSULTING, LLC, SAVASENIORCARE ADMINISTRATIVE SERVICES, LLC, and SSC SUBMASTER HOLDINGS, LLC, | ) ) ) ) ) | **FILED UNDER SEAL** False Claims Act Violations Unjust Enrichment Payment by Mistake |
| Defendants. | ) ) ) ) ) | **JURY TRIAL DEMANDED** |

## UNITED STATES' CONSOLIDATED COMPLAINT IN INTERVENTION

1.    The United States brings this False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"), action against SavaSeniorCare, LLC, SavaSeniorCare Consulting, LLC, SavaSeniorCare Administrative Services, LLC, and SSC Submaster Holdings, LLC (collectively, "Sava," "Company," or "Defendants") to recover millions of dollars that Sava caused the Medicare program to pay for rehabilitation therapy services that were not covered by the skilled nursing facility benefit (also known as the "SNF benefit"), not medically reasonable and necessary, and/or not skilled in nature. Sava submitted false or fraudulent claims for payment to Medicare for these rehabilitation therapy services and knew or should have known that these services were not eligible for reimbursement under the SNF benefit. Sava currently operates approximately 200 skilled nursing facilities nationwide.

2.      Medicare pays skilled nursing facilities ("SNFs") a daily rate to provide reasonable and necessary skilled nursing and skilled rehabilitation therapy services to qualifying Medicare patients.  The daily reimbursement rate varies based on the anticipated nursing and rehabilitation needs of the beneficiary.  The highest daily rate that Medicare will pay a SNF for rehabilitation therapy is known as "Ultra High" or "Rehabilitation Ultra" ("RU").  The RU level of reimbursement is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time."  63 Fed. Reg. 26,252, 26,258 (May 12, 1998).  Specifically, the RU level is reserved for those patients who require skilled rehabilitation therapy for a minimum of 720 minutes per week from at least two therapy disciplines.

3.      From at least October 1, 2008 through September 30, 2012 (the "relevant time period"), Sava engaged in a scheme to maximize its Medicare revenue by maximizing the number of days it billed at the RU level.  Sava set corporate RU targets without regard to patients' actual conditions or needs and enforced those pre-determined targets at the facility level through the rehabilitation program managers ("RPMs") and the therapists who treated the patients.

4.      Sava's corporate managers threatened facility-level employees with sanctions, including termination of their employment, if they did not meet these billing targets.

5.      Sava's corporate pressure worked and was reflected in its RU billings.  In fiscal year 2006, Sava billed approximately 21 percent of its rehabilitation days at the RU level.  In 2007 and 2008, respectively, that percentage increased to 29 percent and 37 percent.  Starting in fiscal year 2009, Sava's RU-level billing began to increase even more dramatically, rising to 53 percent in 2009, 63 percent in 2010 and 2011, and 59 percent in 2012.

2

6.      Beginning in fiscal year 2009, RU billings at many individual Sava facilities increased even more dramatically. Sava's 122-bed facility in Durham, North Carolina, billed 57 percent of its rehabilitation days at the RU level in 2006 and increased to billing 96 percent in 2009 and 95 percent in 2010. Sava's 180-bed Woodwind Lakes facility in Houston, Texas, billed 16 percent of its rehabilitation days at the RU level in 2006 and increased to billing 72 percent in 2009 and 84 percent in 2010. Sava's 120-bed Pendleton facility in Mystic, Connecticut, billed 37 percent of its rehabilitation days at the RU level in 2006 and increased to billing 59 percent of its rehabilitation days at the RU level in 2009, 74 percent in 2010, and 80 percent in 2011. Sava's 120-bed Applewood facility in Longmont, Colorado, billed 14 percent of its rehabilitation days at the RU level in 2006 and increased to billing a peak of 81 percent of its rehabilitation days at the RU level in 2011.

7.      Sava's push to increase its RU billings caused its therapists to provide, and its patients to receive, treatment that was not reasonable and necessary, skilled, and/or covered by the Medicare Part A SNF benefit.

8.      In addition, during the relevant time period, Sava routinely kept patients in its SNFs longer than was necessary to maximize its Medicare payments.

9.      Sava's own billing audits revealed tremendous inaccuracies at a number of its facilities.

10.      Sava also received numerous complaints that incessant pressure to meet RU targets undermined therapists' clinical judgment at the expense of patients' well-being. Despite these complaints, corporate pressure to meet those targets did not abate.

11.      Medicare paid Sava over $1.4 billion for all inpatient SNF services during the relevant time period.

3

12.     The United States brings this action to recover treble damages and civil penalties arising from violations of the FCA and to recover damages and other monetary relief under the common law theories of unjust enrichment and payment by mistake.

## I.      JURISDICTION AND VENUE

13.     This Court has jurisdiction under 31 U.S.C. § 3730 and 28 U.S.C. §§ 1331 and 1345, and supplemental jurisdiction to entertain the common law causes of action under 28 U.S.C. § 1367(a).  The Court may exercise personal jurisdiction over the Defendants because the Defendants reside and/or transact business in this District, or committed proscribed acts in this District.

14.     Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) and (c), as the place where Defendants reside and where a substantial part of the events or omissions giving rise to the claims occurred.

## II.     PARTIES

15.     Plaintiff in this action is the United States of America, suing on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), which administers the Medicare program.

16.     Relators Rita Hayward, Trammel Kukoyi, and Terrence Scott originally filed separate actions, on behalf of the United States, pursuant to the *qui tam* provisions of the FCA, 31 U.S.C. § 3730(b)(1).

17.     Relator Rita Hayward is a licensed counselor and a former director of social services at Sava's Lebanon, Tennessee facility.  On August 26, 2011, Ms. Hayward filed a *qui tam* action against Sava Senior Care, Inc. and certain facility-level defendants.  On March 17, 2015, Ms. Hayward filed an amended complaint that named defendants SavaSeniorCare, LLC,

4

SavaSeniorCare Administrative Services, LLC, SavaSeniorCare Consulting, LLC, and SSC Submaster Holdings, LLC.

18.    Relator Trammel Kukoyi is a licensed social worker and a former employee of Sava's Woodwind Lakes facility in Houston, Texas.  On December 6, 2011, Ms. Kukoyi filed a *qui tam* action in the Southern District of Texas against defendant SavaSeniorCare, LLC and related entities.  On July 30, 2015, Ms. Kukoyi filed an amended complaint.  On October 21, 2015, this Court granted the United States' request to consolidate Ms. Kukoyi's *qui tam* action with the previously-consolidated *qui tam* actions of Ms. Hayward and Relator Terrence Scott.

19.    Relator Terrence Scott is a licensed occupational therapist and a former RPM and staff therapist at Sava's Retama Manor North and South facilities in Pleasanton, Texas.  On November 20, 2013, Mr. Scott filed a *qui tam* action in the Western District of Texas against defendant SavaSeniorCare Administrative Services, LLC.  On February 18, 2014, Mr. Scott filed an amended complaint.  On July 20, 2015, this Court granted the United States' request to consolidate Ms. Hayward's and Mr. Scott's *qui tam* actions.

20.    Defendant SavaSeniorCare, LLC, a Delaware limited liability company headquartered in Atlanta, Georgia, sits atop Sava's corporate structure.  During the relevant time period, SavaSeniorCare, through its subsidiaries, owned and managed the operations of approximately 185 SNFs in 19 states, including Tennessee.

21.    Defendant SavaSeniorCare Consulting, LLC, a Delaware limited liability company, is a wholly-owned subsidiary of SavaSeniorCare.  Pursuant to written agreements with Sava's facilities, SavaSeniorCare Consulting provides certain "consulting" services to Sava's SNFs, including advice on clinical processes and procedures, support for rehabilitation therapy services, and operations oversight.  In return, SavaSeniorCare Consulting receives 2.9 percent of

the net revenue generated by Sava's SNFs. Since 2010, SavaSeniorCare Consulting has employed most of Sava's corporate-level rehabilitation and operations employees, and certain high-level finance employees.

22.    Defendant SavaSeniorCare Administrative Services, LLC, a Delaware limited liability company, is a wholly-owned subsidiary of SavaSeniorCare. Pursuant to written agreements with Sava's facilities, SavaSeniorCare Administrative Services performs certain "back-office" services for Sava's SNFs, including billing and collection support. In return, SavaSeniorCare Administrative Services receives 2.1 percent of the net revenue generated by Sava's SNFs. As part of its service, SavaSeniorCare Administrative Services operates Sava's Centralized Billing Offices ("CBOs"), which generate and submit claims to Medicare for Sava's SNFs. During at least part of the relevant time period, SavaSeniorCare Administrative Services employed Sava's Chief Executive Officer ("CEO"), Chief Financial Officer, Senior Vice President ("SVP") of Rehabilitation Services, and certain high-level finance employees.

23.    Defendant SSC Submaster Holdings, LLC is a formerly active legal entity and wholly-owned subsidiary of SavaSeniorCare. Prior to 2010, SSC Submaster Holdings performed services for Sava's SNFs and employed many of Sava's corporate-level rehabilitation and operations employees. SSC Submaster Holdings ceased to operate in 2010. SavaSeniorCare Consulting performs certain services formerly provided by SSC Submaster Holdings. SavaSeniorCare Administrative Services and SavaSeniorCare Consulting both employ individuals formerly employed by SSC Submaster Holdings.

6

## III.     THE FALSE CLAIMS ACT

24.     The FCA provides, in pertinent part, that any person who:

(A)     knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B)     knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . .

is liable to the United States Government [for statutory damages and such penalties as are allowed by law].

31 U.S.C. § 3729(a)(1)-(2) (2006), as amended by 31 U.S.C. § 3729(a)(1)(A)-(B) (2010).

25.     The FCA further provides:

(1)     the terms knowing and knowingly –

(A)     mean that a person, with respect to information –

(i)     has actual knowledge of the information;

(ii)     acts in deliberate ignorance of the truth or falsity of the information; or

(iii)     acts in reckless disregard of the truth or falsity of the information; and

(B)     require no proof of specific intent to defraud[.]

31 U.S.C. § 3729(b) (2006), as amended by 31 U.S.C. § 3729(b)(1) (2010).

26.     The FCA provides that a person is liable to the United States Government for three times the amount of damages that the Government sustains because of the act of that person, plus a civil penalty of $5,500 to $11,000 per violation.  31 U.S.C. § 3729(a)(1).

## IV.     MEDICARE'S PART A SNF BENEFIT

### A.     <u>Medicare Coverage of SNF Rehabilitation Therapy</u>

27.     Congress established the Medicare Program in 1965 to provide health insurance coverage for people age 65 or older and for people with certain disabilities or afflictions.  *See* 42 U.S.C. §§ 426, 426a.

7

28.    The Medicare program is divided into four "Parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.

29.    Medicare Part A covers up to 100 days of skilled nursing and rehabilitation care for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days.  42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

30.    In order for rehabilitation therapy provided in a SNF to be covered by Medicare Part A, the following conditions must be met:  (1) the patient must require skilled nursing care or skilled rehabilitation services (or both) on a daily basis; (2) the daily skilled services must be services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis; and (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay, or for a condition that arose while the patient was receiving care in a SNF (for a condition treated during the hospital stay).  42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. § 409.31(b).

31.    Medicare requires that a physician or certain other practitioners certify that these requirements are met at the time of a patient's admission to the SNF and re-certify the patient's continued need for skilled rehabilitation therapy services at regular intervals thereafter.  *See* 42 U.S.C. § 1395f(a)(2)(B); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, § 40.3.

32.    For a therapy service to be considered skilled, it must be "so inherently complex that it can be safely and effectively performed only by, or under the supervision of, professional or technical personnel."  42 C.F.R. § 409.32(a).  Thus, skilled therapy services can only be

administered by, or under the supervision of, trained personnel such as physical therapists, occupational therapists, or speech language pathologists. *See* 42 C.F.R. § 409.31(a).

33.    Skilled rehabilitation therapy generally does not include personal care services, such as the general supervision of exercises that have already been taught to a patient or the performance of repetitive exercises (*e.g.*, exercises to improve gait, maintain strength or endurance, or assistive walking). *See* 42 C.F.R. § 409.33(d); *see also* Medicare Benefit Policy Manual, Ch. 8 § 30.4.1.1 ("Skilled physical therapy services must . . . be of a level of complexity and sophistication, or the condition of the patient must be of a nature that requires the judgment, knowledge, and skills of a qualified physical therapist.").

34.    Medicare Part A will only cover those services that are "reasonable" and "necessary." *See* 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under part A or part B of this subchapter for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member").

35.    In the context of skilled rehabilitation therapy, "reasonable" and "necessary" means that the services must be (1) consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; (2) consistent with accepted standards of medical practice; and (3) reasonable in duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30.

36.    In order to assess the reasonableness and necessity of skilled rehabilitation therapy services and determine whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

The Secretary shall periodically determine the amount which should be paid under this part to each provider of services with respect to the services furnished by it, and the provider of services shall be paid, at such time or times as the Secretary believes appropriate (but not less often than monthly) and prior to audit or settlement by the Government Accountability Office, from the Federal Hospital Insurance Trust Fund, the amounts so determined, with necessary adjustments on account of previously made overpayments or underpayments; *except that no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.*

42 U.S.C. § 1395g(a) (emphasis added).

### B.    Medicare Payment for SNF Rehabilitation Therapy

37.    Under its prospective payment system ("PPS"), Medicare pays a nursing facility a pre-determined daily rate for each day of skilled nursing and rehabilitation services it provides to a patient. *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).

38.    The daily PPS rate that Medicare pays a nursing facility depends, in part, on the Resource Utilization Group ("RUG") to which a patient is assigned.  Each distinct RUG is intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.  From January 1, 2006 to October 1, 2010, there were 53 total RUG levels; effective October 1, 2010, there are 66 total RUG levels.

39.    In general, there are five RUG levels for patients that require rehabilitation therapy:  Rehabilitation Ultra High ("RU"); Rehabilitation Very High ("RV"); Rehabilitation High ("RH"); Rehabilitation Medium ("RM"); and Rehabilitation Low ("RL").

40.    The RUG level to which a patient is assigned depends upon both the number of skilled therapy minutes and the number of therapy disciplines the patient received during a

seven-day assessment period. The following chart reflects the requirements for the five rehabilitation RUG levels.

| Rehabilitation RUG Level | Requirements to Attain RUG Level |
|---|---|
| RU = Ultra High | 1. Minimum 720 minutes per week total therapy<br>2. At least two therapy disciplines<br>3. One discipline must be provided at least 5 days/week |
| RV = Very High | 1. Minimum 500 minutes per week total therapy<br>2. One therapy discipline must be provided at least 5 days/week |
| RH = High | 1. Minimum 325 minutes per week total therapy<br>2. One therapy discipline must be provided at least 5 days/week |
| RM = Medium | 1. Minimum 150 minutes per week total therapy<br>2. Therapy must be provided at least 5 days/week<br>3. Can be any mix of therapy disciplines |
| RL = Low | 1. Minimum 45 minutes per week total therapy<br>2. Therapy must be provided at least 3 days/week<br>3. Can be any mix of therapy disciplines |

Source: 63 Fed. Reg. at 26,262.

41.    Medicare pays the highest rate for those beneficiaries that fall into the RU level. This level is "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time." *See* ¶ 2, *supra*.

42.    Medicare reimbursement also varies within each RUG level depending on: (1) the patient's ability to perform certain activities of daily living ("ADLs"), such as eating, using the toilet, bed mobility, and transfers (*e.g.*, from a bed to a chair), and (2) the extent to which the patient needs "extensive services" such as intravenous treatment, a ventilator, tracheostomy, or suctioning.

43.    ADL scores of A, B, C, L, or X are assigned to each patient. A patient who can perform the activities of daily living without assistance would receive an "A," while a patient who requires assistance with all of these activities, but does not require any of the extensive services, would generally receive a "C." A patient who requires only one of the extensive

services may receive an ADL score of "L," while a patient who requires several of the extensive services would generally receive an ADL score of "X."

44.    The summary charts below show the difference that a rehabilitation RUG level and ADL score have on the Medicare daily reimbursement rate.  These charts reflect the adjusted rates that Medicare paid nursing facilities for rehabilitation beneficiaries in fiscal year 2009 and fiscal year 2012.  Medicare adjusts base rates annually and based on locality.  *See* 42 U.S.C. § 1395yy(e)(4)(E)(ii)(IV).

| RUG Rates:  Federal Rates for Fiscal Year 2009[1] | | | | | |
|---|---|---|---|---|---|
| | Rehabilitation with Extensive Services | | Rehabilitation without Extensive Services | | |
| RUG Level | X | L | C | B | A |
| RU | $ 622.93 | $ 547.06 | $ 528.85 | $ 484.84 | $ 462.08 |
| RV | $ 472.28 | $ 440.41 | $ 425.24 | $ 404.00 | $ 363.03 |
| RH | $ 400.35 | $ 392.76 | $ 370.00 | $ 353.31 | $ 327.52 |
| RM | $ 458.31 | $ 420.37 | $ 339.95 | $ 330.85 | $ 323.26 |
| RL | $ 325.37 | n/a | n/a | $ 299.57 | $ 255.57 |

| RUG Rates:  Federal Rates for Fiscal Year 2012[2] | | | | | |
|---|---|---|---|---|---|
| | Rehabilitation with Extensive Services | | Rehabilitation without Extensive Services | | |
| RUG Level | X | L | C | B | A |
| RU | $ 737.08 | $ 721.01 | $ 558.79 | $ 558.79 | $ 467.23 |
| RV | $ 656.06 | $ 588.60 | $ 479.38 | $ 415.13 | $ 413.52 |
| RH | $ 594.39 | $ 530.14 | $ 417.71 | $ 375.95 | $ 330.97 |
| RM | $ 545.24 | $ 500.27 | $ 366.95 | $ 344.47 | $ 283.43 |
| RL | $ 478.85 | n/a | n/a | $ 356.78 | $ 229.89 |

---

[1]  73 Fed. Reg. 46,416, 46,424 (Aug. 8, 2008).

[2]  76 Fed. Reg. 48,486, 48,501 (Aug. 8, 2011).

45.    Effective October 1, 2010 and October 1, 2011, CMS made certain modifications to the RUG-III reimbursement structure by implementing its RUG-IV classification system and other changes.   Among other revisions, CMS revised the rules pertaining to the delivery of concurrent therapy and group therapy.   74 Fed. Reg. 40,288 (Aug. 11, 2009); 76 Fed. Reg. 48,486 (Aug. 8, 2011).  The criteria for the five rehabilitation RUG levels did not change with the RUG-IV classification system.

**C.**    **Medicare Claims for Payment of SNF Rehabilitation Therapy**

46.    Medicare requires SNFs to periodically assess each patient's clinical condition and functional status, as well as their actual and expected use of services.  SNFs are required to report the results of these assessments using a standardized tool known as the Minimum Data Set ("MDS").[3]  The MDS is used as the basis for determining a patient's RUG level and, therefore, the daily rate that Medicare will pay the SNF to provide skilled nursing and skilled therapy to that patient.

47.    In general, a nursing facility must assess each patient and complete the MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's stay in the facility.  The date the facility performs the assessment is known as the "assessment reference date."  A nursing facility may perform the assessment within a window of time before this date or, under certain circumstances, up to five days after.  When a nursing facility performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the assessment reference date. This seven-day assessment period is referred to as the "look-back period."

---

[3]  Effective October 1, 2010, CMS required SNFs to use a revised MDS form, known as MDS 3.0.  The prior form was referred to as MDS 2.0.  Both forms collect substantially the same information.  All references to the MDS herein shall apply equally to both MDS 3.0 and MDS 2.0, unless otherwise noted.

48.    The "Special Treatments and Procedures" section of the MDS requires a SNF to report the number of minutes of skilled rehabilitation therapy the facility provided to a patient during the look-back period as well as the type(s) of therapy provided.[4]  In particular, a SNF must report in that section the number of days and minutes of therapy the SNF provided to a patient in each of the following skilled rehabilitation therapy disciplines:  physical therapy, occupational therapy, and speech-language pathology.  This information directly impacts the RUG level assigned to each patient and therefore the amount of reimbursement that the SNF will receive for that patient.

49.    In most instances, the RUG level determines Medicare payment prospectively for a defined period of time.  *See* 63 Fed. Reg. at 26,267.[5]  For example, if a patient is assessed on day 14 of his stay, and received 720 minutes of therapy during days 7 through 14 of the stay, then the facility will be paid for the patient at the Ultra High RUG level for days 15 through 30 of the patient's stay.[6]

50.    Prior to October 1, 2010, the nursing facility would transmit the MDS form electronically to the state's health department or other appropriate state agency, which in turn would transmit the data to CMS.  42 C.F.R. § 483.20(f)(3) (2009); 42 C.F.R. § 483.315(h)(1)(v) (2009).  Since October 1, 2010, nursing facilities transmit this information directly to CMS. 42 C.F.R. § 483.20(f)(3).

---

[4]  These requirements fell under Section P of MDS 2.0 and Section O of MDS 3.0.

[5]  Payment for days 1 through 14 is based on the number of therapy minutes provided through the five-day assessment, as well as an estimate of the number of minutes to be provided through day 14.  *See* 63 Fed. Reg. at 26,265-67; 64 Fed. Reg. 41,644, 41,662 (July 30, 1999).

[6]  Effective October 1, 2011, SNFs must complete a Change of Therapy Other Medicare Required Assessment if the amount of therapy provided over a seven-day observation period would cause the patient to be classified in a different RUG category.

14

51.    Completion of the MDS is a prerequisite to payment under Medicare.  *See* 63 Fed.
Reg. at 26,265.  The MDS itself requires a certification by the provider that states, in part:  "To
the best of my knowledge, this information was collected in accordance with applicable
Medicare and Medicaid requirements.  I understand that this information is used as a basis for
ensuring that residents receive appropriate and quality care, and as a basis for payment from
federal funds."  MDS Versions 2.0 and 3.0 for Nursing Home Resident Assessment and Care
Screening.

52.    A patient's RUG information is incorporated into the Health Insurance
Prospective Payment System ("HIPPS") code, which Medicare uses to determine the payment
amount owed to the nursing facility.  The HIPPS code must be included on the CMS-1450, which
nursing facilities submit electronically to Medicare for payment.  Medicare Claims Processing
Manual, Ch. 25, § 75.5.  Medicare payment will depend largely on the HIPPS code the nursing
facility submitted as part of the CMS-1450.  *See* 63 Fed. Reg. at 26,267; Medicare Claims
Processing Manual, Ch. 25, § 75.5.

53.    SNFs submit the CMS-1450 electronically under Medicare Part A to Medicare
payment processors known as Medicare Administrative Contractors ("MACs") (formerly known
as Fiscal Intermediaries ("FIs")).  MACs process and pay Medicare Part A claims for skilled
nursing and rehabilitation therapy services in SNFs.  During the relevant time period, SNFs
operated by Sava submitted Part A claims to the following FIs/MACs:  Novitas Solutions, Inc.;
Wisconsin Physician Services Insurance Corporation; and TrailBlazer Health Enterprises, LLC.

## V.    SAVA MANAGEMENT CONTROLLED REHABILATION SERVICES AND OPERATIONS AT THE FACILITY LEVEL

### A.    Sava's Rehabilitation Therapy and Operations Hierarchy

54.    Sava is organized in a pyramidal corporate structure.  Tony Oglesby, Sava's CEO, is at the top of Sava's corporate structure.  Mr. Oglesby has served as Sava's CEO since 2005; he acquired majority ownership of the Company in October 2013.

55.    Sava is organized in geographic divisions below Mr. Oglesby.  The number, names, and boundaries of these divisions have changed over time.  In late 2008, Sava had four divisions:  Atlantic Coast, Coast-to-Coast, Texas, and West.  By 2009, and for most of the relevant time period, Sava had two divisions:  East and West.  Sava further subdivides these divisions into regions.

56.    Sava's corporate rehabilitation department is led by Stacey Hallissey, who served from 2006 through at least 2012 as SVP of Rehabilitation Services.  As SVP of Rehabilitation Services, Ms. Hallissey reported directly to Mr. Oglesby.  From approximately early 2013 through the present, Ms. Hallissey has served as the SVP of Clinical Services and, in that role, continues to oversee Sava's rehabilitation department.

57.    Below Ms. Hallissey in the rehabilitation department are Division Vice Presidents ("DVPs") of Rehabilitation Services, who report directly to Ms. Hallissey.  During the relevant time period, each of Sava's geographic divisions was led by at least one DVP of Rehabilitation Services.  The West Division had two DVPs of Rehabilitation Services from approximately December 2008 through April 2011, and one DVP from April 2011 through at least September 30, 2012.

58.    During the relevant time period, in Sava's rehabilitation department, each region was managed by a Regional Director of Rehabilitation ("RRD") (also known as Regional Rehab

16

Manager for part of the relevant time period), who reported to the DVP overseeing his or her region.

59.    At the next level down, the rehabilitation department at each SNF is managed by an RPM.  Though based at individual SNFs, during the relevant time period, these RPMs reported to the RRD in their region; the RPMs also reported on a dotted line to the SNF administrator.  The RPM at each facility was the primary person responsible for managing the rehabilitation therapy staff at each facility and for ensuring that the therapists provided the therapy minutes necessary for the facility to meet its Ultra High targets.  Sava's corporate rehabilitation department held authority over hiring, firing, and compensation decisions for individual RPMs at Sava's SNFs.

60.    Sava's corporate rehabilitation department, led by Ms. Hallissey, disseminated policies and procedures that all of Sava's SNFs were expected to follow.

61.    Sava's corporate operations department is structured in a similar manner.  Each geographic division has a Division President, who reports directly to Mr. Oglesby.

62.    A Regional Vice President of Operations ("RVPO") for each region within the Division sits below the Division President.  The administrator for each SNF reports to his or her RVPO.

63.    Generally, the administrators at Sava's SNFs had no clinical training or certification in the provision of skilled rehabilitation therapy.  Nonetheless, they often participated in planning patient care.  As a result, administrators often took an active role in enforcing Sava's corporate targets for billing at the RU level and extending the amount of time that patients stayed in Sava's SNFs.

17

64.     The therapy staff of each facility typically included physical therapists, physical therapy assistants, occupational therapists, certified occupational therapy assistants, and speech-language pathologists.

65.     Each Sava SNF had at least one MDS coordinator.  This individual, usually a registered nurse, was responsible for collecting all of the information needed for the MDS and determining the assessment reference date (and thus the seven-day look-back period that would be used to determine each patient's RUG level).   In practice, however, Sava's corporate rehabilitation department pushed facility-level employees to choose the days that would result in the highest RUG level and, therefore, the highest payment to Sava.

66.     Sava submitted the MDS forms to state agencies (prior to October 2010) and then to CMS directly (after October 2010) with the intention that Medicare would rely upon the MDS information to set patient RUG levels and pay Sava's claims based on those patient RUG levels.

**B.     Sava's Centralized Claim Submission and Payment Process**

67.     Sava retains central control over the submission of claims for services provided at its SNFs and for the receipt of payment for those services.

68.     On the submission side, Sava operates and maintains two CBOs – in Baltimore, Maryland and in Houston, Texas – that bill Medicare on behalf of Sava SNFs.

69.     Prior to 2008, most Sava facilities submitted their own claims.  Beginning in 2008, however, Sava directed some of its SNFs to bill Medicare through its CBOs.  As of 2008, approximately one-sixth of Sava's SNFs used a CBO to submit claims to Medicare; by 2012, over 80 percent did so.

70.     Sava's CBOs are staffed by employees of SavaSeniorCare Administrative Services.  Those employees generate claims based on data received from Sava's SNFs, report

errors and missing information back to the facilities, and submit claims to Medicare, including, upon information and belief, at least some of the false or fraudulent claims described in this Complaint.

71.    Reimbursements were likewise centralized.  Though individual facilities had their own bank accounts, all payments received for Medicare services provided at Sava SNFs – whether for claims submitted by a CBO or a facility – were swept daily into a single "concentration" account maintained by the Company, through its subsidiaries.  As such, Sava received the proceeds of the false claims noted herein.

## VI.    SAVA'S FOCUS ON ULTRA HIGH AND PATIENTS' LENGTHS OF STAY TO INCREASE MEDICARE REIMBURSEMENT SUBJECTED ITS SNF PATIENTS TO UNNECESSARY THERAPY TREATMENTS

72.    From at least October 2008 through September 2012, Defendants, through their executives, officers, managers, and employees, systematically pressured Sava SNF administrators, RPMs, and therapists to meet corporate targets for Ultra High therapy billing and extend patients' lengths of stay without regard to Sava's patients' actual needs.

73.    The corporate pressure to meet these targets caused Sava's therapists to provide therapy that was not reasonable or necessary, skilled, and/or covered by the Medicare Part A benefit.

74.    As a direct result of these practices, Sava submitted false statements and false claims to Medicare and received millions of dollars in reimbursement to which it was not entitled.

### A.    Sava Set Ultra High Goals Without Regard for Clinical Need

75.    Sava knew the financial benefits of increasing its Ultra High billings.  In August 2011, SVP Hallissey performed a Company-wide analysis confirming that Sava was "better off

to have a higher expense and hit an RU category versus provide fewer minutes (and less cost) and hitting an RV." Ms. Hallissey performed the same analysis by facility, again concluding that "it is 100% always more profitable for us to have the higher expense and be in the higher [RUG] category."

76.    At least as early as 2008, for each relevant budgeting time period, Sava's finance department set top-level goals – "budgets" – for the Company.

77.    In at least one instance, the top-level budget was set purely based on Sava's owners' revenue expectations.

78.    Based on the top-level company goals, Sava's finance department then set goals for each of Sava's geographic divisions. Sava's corporate-level rehabilitation employees in turn set rehabilitation-specific goals at the divisional, regional, and facility level based on finance's overall goals and without regard for Sava's patients' individual medical needs.

79.    Sava set these goals for every one of its SNFs based on meeting pre-determined RU levels and Medicare Part A daily rates, which were directly tied to the RUGs levels. These prospective RU and Medicare Part A daily rate goals were divorced from the individualized needs of Sava's patient population and instead tied to Sava's top-level corporate goals and designed to increase Sava's RU billings and Medicare revenue.

80.    Sava used these internally-created metrics to monitor the Company's performance in billing Medicare for the highest-reimbursing RUG codes.

81.    Sava consistently increased the budgets of every Sava facility within the framework of the Company's top-level financial goals and based on the facility's past performance plus a "stretch" of that performance.

20

82.    Although DVPs of Rehabilitation Services and RRDs could change the budget for a facility in their division or region, any changes had to be "budget neutral" (*i.e.*, reducing one facility's RU goal required increasing another's RU goal).

83.    Sava knew that its budgets were aggressive.  In December 2009, for example, DVP of Rehabilitation Services Tracy Hayworth warned SVP Hallissey and DVP of Finance Candace Gunderson that draft budgets for Sava's Texas SNFs for the upcoming trimester represented a big stretch.  "Not to be bleak but we are really pushing some facilities," she wrote, "and the clinical need is being met with current run numbers."

84.    Corporate-level managers instructed facilities that these budgets were not optional, even though lower-level corporate managers and facility RPMs often saw the budgets as unattainable.

85.    As one RRD, Kristy Daves, expressed in a September 2008 email to her manager, DVP of Rehabilitation Services Kimberly Williams (also known as Kimberly Utts during part of the relevant time period), "Not sure if it's worth succeeding anymore . . . the expectation just goes higher!  I haven't even book[ed] a [Medicare Part A daily] rate higher than $400 yet . . . and my budget goes to $408 . . . yes, I'm breathing . . . it's a struggle!  Yes, I will get over it and buy into it, as always, the 408 just hit hard!!!!"

86.    An RPM at Sava's Northwest SNF in Houston, Texas likewise complained to her RRD, Roy Meade, in January 2010 that her facility's budget was unrealistic and left her "extremely disheartened."   In a subsequent email, she added:  "[N]o matter how I look at it - it is not do-able. . . . This is the first time in all the years that I have been here that I truly feel like corporate is being unfair and setting me up for failure."

87.    Sava employed various strategies to meet its RU and Medicare Part A daily rate budgets, including setting RU as the "default" RUG level for newly-admitted patients, regardless of whether it was clinically indicated.

88.    For example, RRD Patricia Fairbank instructed her RPMs in an August 2008 email:  "Y'all should start out with every admission attempting a U.  You can always back down if the U is not appropriate; but you would be surprised how many people will tolerate whatever we give them."

89.    Similarly, in July 2009, RRD Elizabeth Roseberry emailed her RPMs:  "We had 3 facilities that fell below 70% RU this month.  We ALL need to revisit the focus of making everyone a RU for the first 2 assessments unless they have a terminal illness."  (Emphasis original.)

90.    In October 2009, RRD Lee Anne Scheibelhut emailed DVP of Rehabilitation Services Mary Beardsley an agenda for a call with her RPMs, which included the item, "[e]very new admit is an RU[.] . . . Must hit in 5 day and 14 day. . . ."

91.    In a January 2010 email from RRD Brenda McCarroll to SVP Hallissey that copied DVP Williams and provided an update on Sava's Wilmington, North Carolina SNF, Ms. McCarroll wrote:  "**The Plan to increase the RU**[:]    All skilled residents to be placed in RU . . . ." (Emphasis original.)

92.    Further, Sava often instructed the SNFs to aim for an RU if the patient could "tolerate" 720 minutes of therapy each week, without discussion of clinical need.

B.    **Sava Management Enforced Its Ultra High Billing Goals**

93.    Sava's RU budgets were not merely aspirational.  Sava put constant pressure on both regional and facility-level employees to make their ever-increasing budgets.  This pressure

was top-down, nationwide, and exerted by both rehabilitation and operations corporate-level employees.

94.     In May 2009, for example, SVP Hallissey demanded that DVP Beardsley arrange in-person reviews with certain RRDs because they "[j]ust cannot seem to get enough traction. . . . Of the 15 Regions and 18 sub regions[,] Mou[n]tain A B & C take 3 of the last place regions in the company for RU for the month of April.  Central in Texas is the only other one rounding out the bottom 4.  We have to reverse this trend and reverse it quickly."  Ms. Beardsley agreed:  "I am livid at these numbers.  [RRD Scheibelhut] seemed to have things going in the right direction but did not come through with the RU. . . .  [RRD Holly Bell] is just plain flailing and [RRD Brandy Morgan] almost squeaked by with missing RU by .4%."

95.     Sava communicated and enforced its goals for RU billing through many vehicles, including action plans, performance evaluations, calls and visits with facilities, and rankings.

96.     Sava employed these tools to micromanage RU utilization at its facilities.

97.     RRD Symon Madrid's March 13, 2009 action plan for one of his SNFs specifically stated:  "RRD to micro manage RUG's utilization at [these] 2 facilities by calling them weekly and reviewing RUG's distribution."

98.     In October 2011, DVP Beardsley emailed her team:  "We are waaaayyyy down as far as RU %age for the division!  What is going on???  . . . I am very worried about our numbers for the month, trimester and year.  Please do a drill down on your region and get back to me asap.  [Division President Scott Harris] and [DVP of Finance Pamela Forstell] were expecting a significant pick up in October due to our steep fall off in September.  There will be serious questions to be answered on op[eration]s calls!"

23

99.     In December 2008, RRD Richard Madrzak required his RPMs to use a weekly rehabilitation meeting chart to "address why we are not hitting a RU.  We are noticing that very few of our 5 day assessments are RU. (across all of North Texas) [sic]."

100.     Similarly, RRD Kevin Lindsey wrote to his RPMs in June 2012:  "As for RU% we are over as a Region but there are a couple of buildings that are under the 40% threshold.  If you are under 40% I need a real good explanation as to what is going on.  Census?  Type of patients?  Staffing?  OMRA's?  LOS?  Do a good drill down and see what kind of plan we can put in place to get back to budget."

101.     Sava's corporate-level rehabilitation managers also used tracking software systems to assess patients' RUG categories.  In April 2012, DVP Hayworth emailed several instructions to one RPM regarding therapy plans for specific patients.  Though Ms. Hayworth had likely never seen, met, or evaluated the patients, she stated that she had "just reviewed projections in ROX," the software Sava used to track RUG levels and other therapy metrics, and had "comments/questions" about the assigned minutes, assessment reference dates, and RUG levels for those patients.

102.     Facilities in some regions and divisions had to justify their reasons for not assigning a patient to the RU RUG level.  At times, Sava management coupled demands for these justifications with threats that employees would face repercussions if they did not meet their budgets.  RRD Fairbank emailed her team in October 2011 that "we have seriously missed revenue by something like 1 million $ in Sept.  **Yepper, 1 million $!** . . . Unless you[r] building is achieving your Ultra budgets for October, and you contact me with clear reasons why you are not achieving them, I will expect a treatment planning tool to be completed on every new eval going forward. . . . I hate to be a nudge over this; however, **we really do not want more salary**

**cuts but we cannot survive losing a million $ per month**." (Emphasis original.) In response, DVP Hayworth sanctioned the aggressive approach: "Wow! I feel ur [sic] sense of urgency! If I had patient I would send u [sic] my treatment planning tool!" Ms. Fairbank responded, "LOL."

103. Sava developed the Treatment Planning Tool as a clinical guide or "thought process" for its therapists to use when determining a patient's underlying impairments and then developing a treatment plan based on those impairments. The Treatment Planning Tool for each discipline (physical and occupational therapy and speech-language pathology) asks the treating therapist to identify the number of minutes expected for each treatment approach. Although Sava used the Treatment Planning Tool to determine the amount of therapy provided to a patient, and a result, billed to Medicare, the Treatment Planning Tool was seen as a "thought process," and not an official form to be included in patients' medical records.

104. While Sava applauded its facilities that met or exceeded their budgets, it singled-out facilities that failed to meet targeted RU levels.

105. Sava's corporate-level rehabilitation and operations employees also regularly disseminated facility comparison reports to publicly shame facilities into improving their performance. Sava often used a "stop-light" system to rank its facilities; RRDs praised the "green" facilities while admonishing the "red" facilities to improve.

106. As RRD Roseberry wrote to her RPMs in August 2009: "NOW THE PLAN IS TO STOP SEEING SO MUCH RED OK? THIS IS A MUCH PRETTIER COLOR WOULDN'T YOU AGREE? IT ALSO MEANS WE DON'T HAVE TO ANSWER ANY QUESTIONS BECAUSE WE[] ARE MANAGING OUR NUMBERS DAILY FOR **SUCCESS**! . . . THANK YOU VERY MUCH FOR PAYING ATTENTION TO THESE NUMBERS

25

DAILY SO THAT YOU CAN LEAD YOUR FACILITY FROM RED TO GREEN!"
(Emphasis original.)

107.    RRD Jeannie Joven emailed a similar message to her team in September 2011:
"Congratulations to - CAMBRIDGE EAST, CAMBRIDGE SOUTH , VIRGINIA HIGHLANDS
- GREEN. . . .    For everybody that is yellow and red, please drill down on our
barriers/challenges/ reasons for not meeting expectations.  Once root cause is known, please
email to me by Monday at noon your root cause and action plan that will have immediate impact
so we can improve before the [end of month]."

108.    Sava also identified "focus facilities" that were even more carefully scrutinized.
The "focus" for these facilities was frequently to improve their metrics (*e.g.*, "Increase RU to
65%"; "Increase ALOS [average length of stay]/Medicare").  In one focus facility update sent to
SVP Hallissey, DVP Williams reported that corporate-level managers had met with the RPM at a
Sava SNF in Wisconsin "to have one of those come to Jesus meetings regarding the RUGs."

109.    Facility-level RPMs that failed to meet targeted levels for RU were often placed
on "success" or "action" plans designed specifically to increase both RUG levels and length of
stay.  One such draft action plan required the RPM at Sava's Spring Creek SNF in Colorado to
"ensure that all budgeted Rehab targets are met or exceeded on a monthly basis," including
"RU% 50%" and "track group treatment and ensure at least 15% group participation with skilled
patients."  The action plan concluded by warning, "Failure to meet these expectations may lead
to further corrective action."

110.    Another RPM at Sava's The Village facility in Texas was put on an action plan in
August 2009 even though her facility's patient population did not allow her to meet her budgeted
metrics.  The RPM had reported to her RRD, Roy Meade, "I would like to for sure take a few

26

medicare [sic] residents to an ultra high level, However [sic] two are semi-comatose, One [sic] is Quadraplegic, and two of them have a serious psychosis going on.  I am keeping these people on for an extended amount of time past 60 days and I ramp up and I ramp down with the minutes." Despite this, Mr. Meade responded, copying DVP Hayworth, "I am unable to understand why you are no longer able to direct your program to produce the same results that they have historically produced.  I am requiring an action plan to address your current underperformance to plan . . . and what you are going to do to be at plan by the end of the month."

111.    Employees that failed to hit their targets could lose their jobs.  In a September 2009 "Region Variance Analysis," RRD Bell wrote that Sava's San Juan facility in Colorado "missed RU utilization by 5% resulting ($15.47) [in the Medicare Part A daily rate].  Plan is to replace RPM."

112.    Although Sava scrutinized any patients who were not assigned to the RU RUG level or whose RUG level decreased, it presumed that all patients assigned to the RU RUG level or whose RUG level increased were clinically indicated and did not question them.

113.    In another effort to drive RUs, Sava awarded bonuses to employees at the facility and corporate levels based in part on achieving the budgeted Medicare Part A daily rate and RUG levels.

114.    The effect of Sava's policies and practices was to impose pressure on facility-level administrators and RPMs, and in turn the treating therapists, to provide enough therapy to push their Medicare patients into the Ultra High payment level.  As a result of this corporate pressure, facility-level RPMs set revenue-based RUGs targets for patients instead of relying on the professional judgment of the therapists who were actually treating the patients.

115.    Therapists who worked in Sava's SNFs were expected to do whatever it took to achieve the corporate goals for RUGs billing. For example, if a SNF was struggling to reach its RU goals, the SNF would be told to think creatively about how to obtain the minutes necessary to bill more patients at the RU level.

116.    Similarly, Sava did not tolerate therapists' resistance to increasing the amount of therapy given to patients. For example, RRD Scheibelhut wrote to DVP Beardsley in April 2009 regarding Sava's Sheridan facility in Colorado: "They have not fully embraced the fact that there is much potential for increased RUG distribution. . . . I am training staff tomorrow on RUG expectations and increased utilization and service delivery. They are also working on hitting the RU category for the 5 and 14 day [assessment reference date]. They have not been doing this. . . . There is one PT that is very resistant to increasing service delivery. She is being dealt with one on one by the RPM. She is now dictating the expected minutes daily."

117.    In Sava's view, a patient's refusal to participate in therapy was not an acceptable reason to miss scheduled therapy minutes. As one RPM at Sava's Odin facility in Illinois instructed her therapists in September 2011, "Unacceptable misses [of therapy]: holidays, therapist absence, or resident refusals and missed appointments."

118.    Similarly, if a therapist in one discipline (*e.g.*, physical therapy) did not provide enough minutes of therapy, management would instruct a therapist in a different discipline (*e.g.*, occupational therapy) to make up whatever minutes were needed to move the patient into the Ultra High category.

C.    **Sava Mandated Group Therapy Sessions to Boost Ultra High Billings**

119.    In group therapy, a single therapist conducts the same therapy exercises with two to four beneficiaries at the same time. Until October 1, 2011, if a therapist provided 60 minutes

28

of the same therapy to two, three, or four beneficiaries at the same time, a SNF could attribute 60 minutes of time to each patient when determining that patient's RUG level.  *See* 64 Fed. Reg. at 41,662.  On October 1, 2011, CMS began requiring SNFs to divide the amount of time spent administering group therapy among the number of beneficiaries in the group; thus, if 60 minutes of group therapy were provided to four beneficiaries, the SNF could attribute only 15 minutes to each beneficiary.  *See* 76 Fed. Reg. at 48,491.

120.    Concurrent therapy is the treatment of two residents at the same time who are not performing the same or similar activities.  Until October 1, 2010, if a therapist provided 60 minutes of concurrent therapy to two beneficiaries at the same time, a SNF could attribute 60 minutes to each patient when determining each patient's RUG level.  *See* 74 Fed. Reg. at 40,319-20.  On October 1, 2010, CMS began requiring SNFs to divide the amount of time spent administering concurrent therapy between the two beneficiaries serviced; thus, if 60 minutes of concurrent therapy were provided, the SNF could attribute only 30 minutes to each beneficiary. *See* 75 Fed. Reg. 42,886, 42,889 (July 20, 2010).

121.    From 2008 through September 2011, Sava set aggressive goals for the amount of therapy to be given to beneficiaries in group settings.  Because it was the patient's time in therapy that counted towards the total number of therapy minutes, not the therapist's time, using group therapy provided Sava with a means of easily increasing a patient's total therapy minutes and thus the RUG level for that patient.  Sava's aggressive group therapy goals resulted in the delivery of unnecessary group therapy to patients for whom group therapy neither related to their plans of care nor included activities in which they could have reasonably been expected to participate.

122.    Although Sava's targets for group therapy fluctuated over time, it consistently enforced those targets.  In a December 2008 email to RPMs and administrators, RRD Meade wrote, "Group utilization for Skilled patients is a part of the key to success.  Everyone should make sure that skilled patients are participating in at least one group weekly [w]ith an average for the department of 10% group minutes to total therapy provided for [Medicare Part] A and managed. . . . All of the targets are achievable."

123.    In August 2009, DVP Williams emailed her RRDs:  "Group therapy[:]  Company standard is now 20%[.]  . . . Groups must be scheduled DAILY[.]  I have attached a group cheat sheet to provide the max minutes."  (Emphasis original.)  Ms. Williams later forwarded her email to SVP Hallissey.

124.    In December 2010, DVP Williams sent certain of her RRDs and RPMs an email with the subject line "CRITICAL - Rehab Groups percentage critically low."  In her email, Ms. Williams admonished, "You are receiving this e-mail because your facility rehab department is well below the company standard for group therapy. . . .  We have addressed provision of group therapy services for over a year now.  **Company standard is 20[]%.**  In order to increase your group percentage to the company standard please implement the following system immediately."  (Emphasis original.)  The same day, DVP Beardsley sent the same email to certain of her RRDs and RPMs.

125.    Later that month, DVP Beardsley emailed her RRDs again about group therapy, noting that "[g]roup percentage is down EVERYWHERE in our facilities.  Please get all over that."  (Emphasis original.)

126.    When CMS reduced the reimbursement for group therapy in October 2011, the amount of group therapy that Sava provided to its Medicare patients plummeted.

30

127.    RRD McCarroll emailed her RPMs in late September 2011, copying DVP Hayworth and RVPO Gary Trullinger, and instructed: "Group[:] This needs to be discontinued with our medicare [sic] patients as all mins are now divided by 4[.]  We can still group patients who are non RUG managed care and [Medi]CAID patients as they do not fall under the new rules.  I will be monitoring minute management in all facilities and calling each of you this week."

128.    Similarly, SVP Hallissey emailed senior leaders in Sava's finance and operations departments in late September 2011 about the CMS rule change regarding group therapy, noting: "Our behavior will change now that we know the rules.  We had no idea CMS would make the last minute change."

### D.    Sava Pushed Modalities to Increase Its RU Billings

129.    "Modalities" are treatments such as ultrasound, shortwave, and microwave diathermy (electrically induced heat) treatments, electrical muscle stimulation ("E-stim"), hot packs, and whirlpool baths that are used as an adjunct to therapy exercises to help reduce pain and inflammation, or to strengthen, relax, or heal muscles.

130.    Sava used modalities as one tactic to expand the number of therapy minutes provided and, as a result, achieve more RUs.  At times Sava set modality goals for its facilities, without consideration for patient need.  In addition, at times Sava insisted that the RPMs justify why every patient not receiving modalities was not receiving them.

131.    Sava's SNFs contracted with Accelerated Care Plus ("ACP") to provide the modality equipment.

132.    RRD Deborah Oliver provided guidance on using modalities to RPMs in February 2009: "ACP - Using it will definitely improve your RUGs & Part B numbers.  If you lo[]se it,

then it'll be much harder your department will work to meet/exceed targets [sic]."  RRD Meade forwarded Ms. Oliver's email to his RPMs as well.

133.    In December 2008, RRD Madrzak instructed his RPMs that each RPM's weekly rehabilitation meeting chart "must address why you are not utilizing ACP with each particular resident."

134.    In an October 2009 email, RRD Roseberry asked her RPMs, copying the administrators for those facilities, "Do you have a commit[]ment from the staff for 2 ACP treatments per day per therapist?  Are you on track for 10 units a day?"

135.    Similarly, an October 2010 email from RRD Meade to his RPMs reminded them that "ACP is 50% or better of the skilled caseload."  Mr. Meade's email does not indicate what Sava's SNFs should do if modalities were not clinically indicated for 50 percent of their skilled patients.

136.    RRD Fairbank emailed her RPMs in October 2011, copying DVP Hayworth and RVPO Darryl Ehlers, and wrote, "Team, we are trending to be below expectation for RUs in our region.  I want you to be aware of the following; [sic] as I will be asking you the same questions if you are not at your budget."  Ms. Fairbank's email included as one question, "Are we using the unattended modalities to stretch out those near Us that are getting almost 600 minutes anyway??"

   **E.    Sava Made Treatment Decisions Based on Its Unwillingness to Provide "Free Therapy" Rather Than on Patient Needs**

137.    Once a patient reaches the Ultra High level, additional minutes of therapy beyond the 720 minute threshold do not result in any increase in Medicare payments.  As a result, Sava's leadership actively policed therapy "overages" (*i.e.*, providing rehabilitation therapy minutes to patients in excess of RUG level thresholds) and considered them to be giving away "free therapy."

32

138.    Sava's minute management to avoid "overages" is contrary to CMS guidance, which provides that "[a]ll of the groups were created based on a continuum of minutes being provided, including Ultra High.  Just as we expect to see beneficiaries in the High Rehabilitation sub-category receiving 450 minutes per week, we expect that as many minutes as are needed will be provided to beneficiaries in the Ultra High groups."  64 Fed. Reg. at 41,663.

139.    To monitor overages, Sava regularly circulated "overage" reports reflecting the amount of therapy provided above a particular RUG threshold.  For example, if a patient received 800 minutes of therapy, that would be 80 minutes above the Ultra High threshold of 720 minutes, or an 11 percent overage.

140.    In November 2008, RRD Meade emailed his RPMs about the prior month's overage report, noting that "[m]any of you had a pretty big jump in the greater than 10% category."  He continued, "I am going to need an explanation for every [Medicare] A patient in your facility in the greater than 10% category that is also an Ultra High.  1 or 2 I can accept as being clinically indicated.  Any more than that screams poor minutes management or po[o]r therapist compliance with assi[gn]ments.  I need to understand why we are giving away free therapy over and above our maximum reimbursement level. . . . We have to get ou[r] hands around this and get back on track."

141.    In June 2009, RVPO Bob Kalin emailed the administrators he managed, copying certain RRDs, and attached a report "showing all patients who received more than 10% above the required minutes for the rug grouper."  He explained, "For example:  A Rehab Ultra requires 720 minutes of therapy - but we provided 800 minutes -- that is more than 10% of what was required."  He continued, "[i]f the RPM is managing minutes on a daily basis and you are using the ECMB on a daily basis, we should not see these excesses of greater than 10%.  We are not

33

being paid to provide excess minutes.  When you buy a cheeseburger at McDonald's they do not give you a Quarterpounder.  CMS pays us for a Rehab High, we should not being providing a Rehab Very High minutes."

142.    In August 2009, DVP Williams emailed her RRDs:  "Over treatment[:] Company standard is now no more than 5% - I really want us to stick to the 15-20 minute limit."   Ms. Williams forwarded this email to SVP Hallissey.

143.    In an October 2010 email, RRD Julie Rosen questioned an RPM on "minute management," scrutinizing the therapy minutes provided for specific patients.  For one patient projected to receive 835 minutes of therapy, Ms. Rosen noted that "we need to be within 10% of the RUG level.  If you guys are that busy, why are you scheduling so many minutes[?]"

144.    In December 2010, DVP Hayworth emailed her RRDs that she would calculate overages with zero percent as the threshold and that if a patient required over 720 minutes "**due to extenuating circumstances**," the RRD and RPM "**will have to be on a call with me to justify it and I will need copies of all of the documentation to support it** . . . ."  (Emphasis original.)

### F.    Sava's Ultra High Billing Increased Exponentially Between 2006 and 2012

145.    As a result of the pressure that Sava management placed on its SNFs to achieve corporate RU targets, Sava's RU billings rose significantly between 2006 and 2012.

146.    In federal fiscal year 2006, Sava billed Medicare at the Ultra High level for 21 percent of all rehabilitation days.  In federal fiscal years 2010 and 2011, Sava billed 63 percent of its rehabilitation days at the Ultra High level, tripling its fiscal year 2006 Ultra High percentage.

147.    Certain Sava facilities' RU billings increased even more dramatically.  For example, Sava's Durham, North Carolina, SNF increased from billing 57 percent of its rehabilitation days at the RU level in fiscal year 2006 to billing 96 percent at the RU level in fiscal year 2009 and 95 percent in 2010.  Sava's Woodwind Lakes SNF in Houston, Texas, increased from billing 16 percent of its rehabilitation days at the RU level in 2006 to billing 72 percent at the RU level in 2009 and 84 percent in 2010.  Sava's Pendleton facility in Mystic, Connecticut, increased from billing 37 percent of its rehabilitation days at the RU level in 2006 to billing 59 percent in 2009, 74 percent in 2010, and 80 percent in 2011.  Sava's Applewood facility in Longmont, Colorado, billed 14 percent of its rehabilitation days at the RU level in 2006 and then increased to a peak of 81 percent of its rehabilitation days at the RU level in 2011.

G.    **Sava Kept Patients in Its SNFs Longer Than Was Reasonable and Necessary To Increase Reimbursement**

148.    In addition to emphasizing RU billing goals, Sava management stressed that the Company's SNFs must make maintaining census a "wildly important goal."

149.    Census was not just about getting patients in the door; it was about keeping them in there with extended lengths of stay.  As with RUs, Sava employed strategies to increase patients' lengths of stay, including at times requiring facilities to seek permission from RRDs before discharging Medicare beneficiaries who had yet to exhaust their 100-day SNF benefit, even though those RRDs had likely never met, evaluated, or had any firsthand knowledge regarding the clinical needs of any of the patients.

150.    "Length of stay" refers to the average number of days that a SNF's beneficiaries stayed at the SNF, and as described above, Medicare pays SNFs per patient per day.  Sava pressured its facilities and therapists to extend their Medicare beneficiaries' stays in Sava's SNFs to maximize Medicare revenue.

35

151.    Sava's practice ignored patient needs and sometimes resulted in beneficiaries unnecessarily exhausting all 100 days of their Medicare SNF benefit (leaving the beneficiaries with no Medicare Part A coverage for at least 60 days if the beneficiaries later actually needed skilled nursing or rehabilitative care).  As with its Ultra High targets, Sava pushed extending Medicare patients' lengths of stay at every corporate level.

152.    In March 2009, for example, RRD Meade advised his team that he "had been tasked to review all patients that are coming off your [Medicare] A caseload, with the exception of those patients that are exhausting days," and that "[t]herapists are not to write [discharge] orders until we have had our conversation."   The email warned that "[w]ith our census challenges, we can ill afford to take someone off of caseload that we have not done everything for that we possibly can."

153.    This corporate philosophy took root at the facility-level.  As the RPM of Sava's Durham, North Carolina, SNF urged in a memorandum to her therapy staff, "Please be mindful when we have just achieved an Ultra High RUG level for a particular patient and the effective date for that RUG level, when submitting a [discharge] notice.  We have had quite a few patients that we worked so hard to get into an Ultra High RUG category for the 30day [sic] assessment, and then we turn in a [discharge] notice for a day or week after it is going to become effective. We will not be reimbursed for all that hard work and sometimes extra treatments/minutes that we delivered."

154.    Sava's Pendleton facility in Connecticut even implemented a form explicitly requiring therapists not to write discharge orders without first obtaining approval from an RPM and/or RRD.

36

155.    Sava also imposed explicit length of stay goals for certain facilities.  And as with RUs, facilities that failed to achieve those length of stay goals were placed on "focus" lists for extra scrutiny.

156.    The Company touted such measures as a way to reverse a census crisis that, in the words of Division President Peter Lougee, required "draconian measures" to overcome.

157.    In furtherance of that goal, Sava developed a pre-discharge checklist of questions called the "Am I Ready" tool in 2009.  This tool purported to help facilities ensure that they had satisfied patients' needs before those patients returned home.   Documents referencing the Am I Ready rollout, however, stated that the tool was meant to "help drive" or "extend" patient length of stay.  It was understood that extending patient length of stay would positively impact census.

158.    As SVP Hallissey told her DVPs in June 2010: "[W]e need patients to treat.  We can do our part to help with census by making sure we complete the AM I READY process for all residents."

159.    Even though Sava used Am I Ready as a checklist for determining services that a patient should receive, it explicitly instructed its SNFs that the tool should not be included in patients' medical records.

H.    **Sava Received Numerous Warnings and Complaints About Errors Resulting From Its Corporate Targets and Pressure**

160.    During the relevant time period, Sava's internal billing audits revealed tremendous billing error rates at a number of Sava facilities.

161.    Sava took minimal action in response to these results.  The Company's billing audits procedure only called for facilities to be re-audited if they had a more than 10 percent financial error rate or more than a 40 percent RUG error rate.  The billing audits did not evaluate whether the therapy provided was reasonable and necessary.

37

162.    When discussing the results of these audits, Sava employees often expressed more concern about how the error rates were affecting their bonuses, instead of whether Sava was overbilling Medicare.  In October 2009, for example, DVP Williams forwarded SVP Hallissey the results of a billing audit at Sava's Huntington SNF in West Virginia and complained, "Uuuggghhh watching my T3 bonus vanish before my eyes !!"

163.    In December 2010, Sava learned that the HHS Office of Inspector General had identified five Sava facilities as part of a report on "Questionable Billing by Skilled Nursing Facilities."  The Company waited, however, until March 2012 to begin RU audits at certain facilities that included assessing whether the therapy provided was medically necessary.

164.    An internal compliance investigation that Sava performed in 2010 to 2011 revealed serious issues regarding manipulation of therapy minutes and deficiencies with Sava's documentation of rehabilitation therapy services.  Although Sava did implement additional training as a result, and its RU levels dropped slightly in the following year, the corporate pressure did not cease.

165.    Sava received numerous other complaints from therapists that alleged, among other things, that therapists provided unnecessary therapy and that supervisors pressured employees to increase RUG levels.  One therapist at Sava's Canton facility in Georgia complained, for example, "that the therapists are under so much pressure to maximize the group billing code (ie: higher reimbursement rate), that they are willing to compromise the patient in the process."

166.    Sava also received complaints from therapists threatening to resign due to the constant pressure to provide excessive therapy and expressing unwillingness to subject Medicare beneficiaries to unnecessary rehabilitation therapy just to increase beneficiaries' RUG levels.

38

These therapists also stated that they refused to continue to work for Sava because they were not allowed to exercise independent clinical judgment, and because of fear of losing their licenses. For example, the Canton facility therapist further stated, "I am disgusted at the numerous residents I have personally come into contact with who have stated to me repeatedly that they are tired of therapists 'forcing' them (often physically) out of bed" to do therapy, and "I will not participate in that type of behavior, no matter if they 'get their minutes' or not."

167.    A therapist at Sava's North Arundel SNF in Maryland complained, "[My RPM] has undermined my clinical judgment by making unsafe, inappropriate recommendations for pts. on my caseload when she has never evaluated, treated, or even completed a thorough chart review," and that she could not "continue to work under these circumstances" because she had to "protect my licensure, my pts., my reputation, and my job."

168.    Similarly, a therapist at Sava's Durham, North Carolina, SNF wrote in an exit survey that "[t]he lack of respect for my professional opinion [and] patient recommendation (in interaction with my supervisor) was very frustrating.  We were encouraged to communicate our professional recommendations, which were often then ignored.  This seems to be a core issue contributing to high attrition."

## I.    Sava Knowingly Billed Medicare for Services That Were Not Reasonable or Necessary

169.    Sava knew that Medicare only paid for skilled rehabilitation therapy services that were reasonable and necessary, consistent with the nature and severity of the patient's illness or injury and particular medical needs, and performed in accordance with accepted standards of medical practices.

170.    Sava chose to continue pressuring its SNFs to seeker higher RUGs, and longer patient stays, despite warnings that its conduct ran afoul of Medicare rules.

171.    Sava had actual knowledge, recklessly disregarded and/or remained in deliberate ignorance, of the truth or falsity of their claims, representations, and certifications made to federal healthcare programs.  Sava knowingly made, or caused to be made, false or fraudulent claims, representations, and certifications, within the meaning of the FCA, 31 U.S.C. § 3729(b), to Medicare.

## VII.   SAVA BILLED MEDICARE FOR THERAPY SERVICES NOT COVERED BY MEDICARE, NOT NECESSARY AND REASONABLE, AND NOT SKILLED

172.    Between October 2008 and September 2012, Sava increased its revenues by billing for Ultra High level therapy that was not covered by the Medicare Part A skilled nursing facility benefit, not reasonable and necessary, and/or did not constitute a skilled service.  In many instances, Sava imposed therapy services on its patients that did not take into account – or were contrary to – their clinical needs.

173.    When seeking payment from Medicare, a provider is obliged to assure that services provided to beneficiaries are supported by evidence that the services are necessary and reasonable.  *See, e.g.,* ¶ 36, *supra.*  Sava routinely failed to provide support for the reasonableness and necessity of the skilled therapy services provided to patients.

### A.     Sava Billed for Therapy that Was Excessive in Duration

174.    Sava corporate employees pushed extending patients' lengths of stay to increase the Company's Ultra High level of reimbursement.  *See, e.g.,* ¶¶ 148 - 159, *supra.*

175.    Sava held some patients for unreasonable or unnecessary lengths of stay.  For example, Patient A,[7] an 85-year-old female, was admitted to Sava's Northwest facility in

---

[7] The claims that Sava submitted for Patients A through E were false for myriad reasons; only certain bases for their falsity are discussed herein.

40

Houston, Texas.  Patient A received physical and occupational therapy and speech-language pathology services beginning in April 2011 after a hospital stay for diverticulitis.

176.    The therapy evaluation and treatment minutes recorded on Patient A's first therapy day totaled six hours and 10 minutes.  During Patient A's physical therapy evaluation on that first day, she was too fatigued to perform a balance test and was only able to tolerate sitting on the edge of a bed for 15 minutes.  Nevertheless, Sava billed for 60 minutes of physical therapy that same day.

177.    Patient A had a history of dementia; her associated profound cognitive issues meant that her ability to retain and learn new information was very limited.  During a mental status test, Patient A did not know the season, her room location, or even that she was in a nursing home.  Many of the progress notes from Patient A's stay reference that the patient said "no" to "everything."  The therapists treating Patient A constantly discontinued or reduced her therapy goals because they were too difficult for her.  The speech-language pathologist's discharge summary for Patient A indicated minimal change in function over the two months of speech language pathology intervention.

178.    One weekly physical therapy progress note stated that Patient A was to be discharged soon due to lack of progression, but she was still kept on physical therapy for well over two more months.  The physical therapist who wrote that weekly progress note rarely treated Patient A moving forward, and there was no evidence that that physical therapist was involved in writing the patient's subsequent physical therapy progress notes, which were written by a physical therapist assistant.

179.    Sava continued to provide Patient A with enough therapy to qualify for Ultra High reimbursement and to bill Medicare at the RU level for 90 days of Patient A's 100-day

stay. Sava kept Patient A on therapy for over two months longer than was reasonable and necessary.

180.    In addition, Patient B was a 56-year-old female admitted to Sava's Cambridge North facility in Michigan in March 2011 following a hospital admission for acute psychosis, and was later readmitted to the same facility after a very brief stay in an assisted living facility/group home. During her stay, Patient B received physical and occupational therapy.

181.    Patient B's physical therapy goals were constantly increased during her stay. For example, one goal was ultimately updated to going up and down 16 steps, even though the patient had only four or five steps at home and planned to discharge to a group home. As the goals increased, the exercises were repetitive in nature and did not require the unique skills of a physical therapist. Similarly, Sava's occupational therapist continued to provide Patient B with occupational therapy, even once the exercises became repetitive in nature and Patient B no longer required daily skilled occupational therapy.

182.    Sava continued to provide Patient B with enough therapy to qualify for Ultra High reimbursement and to bill Medicare at the RU level for 40 unnecessary days.

183.    Further, Patient C, a 55-year-old female, was initially admitted to Sava's Windsor facility in North Carolina in March 2009 for a 23-day stay before a craniotomy, and then re-admitted following the procedure. Patient C received physical and occupational therapy and speech-language pathology services during her stay.

184.    During her second admission, Patient C was kept on physical therapy 44 days after the physical therapist had documented that she was ambulating independently with a rolling walker. By day 21 of Patient C's 65-day second admission, she had complained of "overdoing it" and was advised to limit ambulation to twice daily from her room to the dining room and

build endurance to prevent setbacks from occurring. Despite this, the physical therapist continued to record gait training daily, and documented essentially the same exercises each time.

185. Sava continued to provide Patient C with enough therapy to qualify for Ultra High reimbursement and to bill Medicare at the RU level for 60 days of Patient C's 65-day second admission.

### B.    Sava Used Unnecessary Modalities To Increase Therapy Minutes

186. Sava corporate employees pushed the use of modalities as a way of increasing therapy minutes in order to reach the Ultra High level of reimbursement. *See, e.g.,* ¶¶ 129 - 136, *supra.*

187. The unreasonable or unnecessary use of modalities is evident in some of Sava's patient files. For example, Patient D, a 77-year-old male, was admitted to Sava's Poplar Living Center in Wyoming. Patient D received physical and occupational therapy and speech-language pathology services beginning in June 2010 after being found at home on the floor, confused, combative, and with slurred speech. He was admitted to the hospital with altered mental status and hypertensive emergency and diagnosed with a right thalamic stroke. Sava billed Medicare at the Ultra High level for all 100 days of Patient D's stay.

188. During the first two-and-a-half months of the patient's stay, E-stim represented 37 percent of the total physical and occupational therapy minutes Sava provided to Patient D. Although E-stim was included in Patient D's plan of care, Patient D's medical record did not support the E-stim provided.

189. Physical therapy recorded E-stim nearly daily for Patient D, representing 43 percent of his total physical therapy minutes recorded. On a number of days, the minutes of E-stim provided by the physical therapist exceeded the time spent on physical therapy exercises.

43

On three consecutive days, and on at least three additional days later in his stay, Patient D spent 30 minutes or less completing physical therapy exercises and 35 minutes receiving E-stim administered by the physical therapist.  Patient D's medical record did not support the E-stim administered by the physical therapist.

190.    Occupational therapy recorded E-stim nearly daily for Patient D, representing 29 percent of his total occupational therapy minutes recorded.  The occupational therapist noted that the patient "appears to be tired as he falls asleep during E-stim" therapy and later noted that the patient was "unable to stay awake during" therapy.  Patient D's medical record did not support the E-stim administered by the occupational therapist.

191.    During the five assessments periods, E-stim accounted for 195, 285, 315, 295, and 145 minutes, respectively, of Patient D's total therapy minutes.  Without the minutes attributable to E-stim, the total minutes for this patient would not have reached the Ultra High level during any of the assessment periods.

### C.    Sava Billed for Unreasonable and/or Unnecessary Group Therapy

192.    In order to increase minutes and bill for Ultra High level services, Sava billed for unreasonable and/or unnecessary group therapy.

193.    Sava corporate employees pushed the use of group therapy as a way of increasing therapy minutes in order to reach the Ultra High level of reimbursement.  *See, e.g.,* ¶¶ 119 - 128, *supra.*

194.    The unreasonable or unnecessary use of group therapy is evident in some of Sava's patient files.  Patient A, discussed in paragraphs 175 to 179, *supra*, received group therapy throughout her stay.  Patient A's plan of care indicated group therapy as a treatment

44

approach, but the weekly physical therapy, occupational therapy, and speech-language pathology progress notes did not support that Patient A participated in group therapy as recorded by Sava.

195.    Without the minutes attributable to group therapy, the total minutes for Patient A would not have reached the Ultra High level during any assessment period other than her 90-day assessment period.

196.    In addition, Patient E, a 55-year-old male, was admitted to Sava's Virginia Highlands facility in Wisconsin.  Patient E received physical and occupational therapy beginning in July 2011 after a hospital stay that included the removal of a testicular mass.

197.    Patient E received group therapy throughout his stay.  Patient E's plan of care indicated group therapy as a treatment approach, but the weekly physical and occupational therapy progress notes did not support that Patient E participated in group therapy as recorded by Sava.

**D.    Specific Examples of False Claims**

198.    Attached to and made part of this Complaint is Exhibit A,[8] which contains a summary chart of 20 false claims made by Sava for the five Medicare beneficiaries discussed in this Complaint.  The claims identified in Exhibit A are illustrative samples of the types of false claims submitted to Medicare by Sava between October 1, 2008 and September 30, 2012.

**Count I:  False or Fraudulent Claims**

(31 U.S.C. § 3729(a)(1)(A))
(previously 31 U.S.C. 3729(a)(1) (1986))
(All Defendants)

---

[8]  Exhibit A identifies the beneficiaries by letter (as they are identified herein) and omits the beneficiary identification numbers to protect patient privacy.  The United States will serve Defendants with a copy of Exhibit A that identifies each patient by name and patient identification number.

199.    The United States repeats and realleges paragraphs 1 through 198 above, as if fully set forth herein.

200.    Defendants knowingly presented, or caused to be presented, to an officer or employee of the United States Government, false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), specifically, claims for payment to Medicare for rehabilitation therapy services that were not covered by the SNF benefit, not medically reasonable and necessary, and/or not skilled in nature.

201.    Because of the defendants' acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

**Count II:  False Statements**

(31 U.S.C. § 3729(a)(1)(B))
(previously 31 U.S.C. 3729(a)(2) (1986))
(All Defendants)

202.    The United States repeats and realleges paragraphs 1 through 201 above, as if fully set forth herein.

203.    Defendants knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), including false Minimum Data Sets.

204.    Because of the Defendants' acts, the United States sustained damages in an amount to be determined at trial, and therefore is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

**Count III:  Unjust Enrichment**

(All Defendants)

205.    The United States repeats and realleges paragraphs 1 through 204 above, as if fully set forth herein.

206.    During the time period between October 1, 2008 and September 30, 2012, the United States paid Sava reimbursements for rehabilitation therapy services that were not covered by the SNF benefit, not medically reasonable and necessary, and/or not skilled in nature.

207.    By directly or indirectly obtaining federal funds from Medicare to which they were not entitled between October 1, 2008 and September 30, 2012, Defendants were unjustly enriched at the expense of the United States, and are liable to account and pay to the United States such amounts, or the proceeds therefrom, which are to be determined at trial.

## Count IV:  Payment By Mistake

(Defendants SavaSeniorCare, LLC, SavaSeniorCare Administrative Services, LLC, and
SavaSeniorCare Consulting, LLC)

208.    The United States repeats and realleges paragraphs 1 through 207 above, as if fully set forth herein.

209.    Defendants SavaSeniorCare, LLC, SavaSeniorCare Administrative Services, LLC, and SavaSeniorCare Consulting, LLC submitted (or caused the submission of) claims for rehabilitation therapy services to Medicare when those services were not covered by the SNF benefit, not medically reasonable and necessary, and/or not skilled in nature, and such claims constitute misrepresentations of material facts in that Defendants misrepresented that the services allegedly provided to Medicare beneficiaries were covered by the SNF benefit, medically reasonable and necessary, and/or skilled in nature.

210.    The United States paid more money to defendants SavaSeniorCare, LLC, SavaSeniorCare Administrative Services, LLC, and SavaSeniorCare Consulting, LLC than it would have based on the erroneous belief that the defendants were entitled to reimbursement and

47

without knowing that the defendants submitted claims for rehabilitation therapy services that were not covered by the SNF benefit, not medically reasonable and necessary, and/or not skilled in nature.

211.    The United States, acting in reasonable reliance that the Defendants' claims were accurate, complete, and truthful, paid defendants SavaSeniorCare, LLC, SavaSeniorCare Administrative Services, LLC, and SavaSeniorCare Consulting, LLC certain sums of money to which it was not entitled, and thus defendants SavaSeniorCare, LLC, SavaSeniorCare Administrative Services, LLC, and SavaSeniorCare Consulting, LLC are liable to account and pay to the United States such amounts, which are to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States as follows:

I.    On the First and Second Counts against Defendants SavaSeniorCare, LLC, SavaSeniorCare Consulting, LLC, SavaSeniorCare Administrative Services, LLC, and SSC Submaster Holdings, LLC, under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

II.    On the Third Count for unjust enrichment against Defendants SavaSeniorCare, LLC, SavaSeniorCare Consulting, LLC, SavaSeniorCare Administrative Services, LLC, and SSC Submaster Holdings, LLC, for the damages sustained and/or amounts by which Defendants were unjustly enriched or amounts by which Defendants retained monies received from reimbursements paid by the United States to which they were not entitled, plus interest, costs, and expenses.

48

III.    On the Fourth Count for payment by mistake against defendants SavaSeniorCare,

LLC, SavaSeniorCare Administrative Services, LLC, and SavaSeniorCare Consulting, LLC for

the amounts they obtained to which they were not entitled, plus interest, costs, and expenses.

IV.    All other relief as may be required or authorized by law and in the interests of

justice.

Dated:   October 26, 2015                      Respectfully submitted,

                                               Benjamin C. Mizer
                                               Deputy Principal Assistant Attorney General


                                               *Alison B. Rousseau (By C.C.S.)*

                                               MICHAEL D. GRANSTON
                                               ANDY J. MAO
                                               ALISON B. ROUSSEAU
                                               S. CHARTEY QUARCOO
                                               Attorneys, Civil Division
                                               United States Department of Justice
                                               P.O. Box 261, Ben Franklin Station
                                               Washington, D.C. 20044
                                               Tel: (202) 353-1192
                                               Fax: (202) 305-7797
                                               alison.b.rousseau@usdoj.gov


                                               DAVID RIVERA
                                               United States Attorney


                                               CHRISTOPHER C. SABIS, BPR #030032
                                               Assistant U.S. Attorney
                                               110 9th Avenue, South, Suite A-961
                                               Nashville, Tennessee 37203-3870
                                               Tel: (615) 736-5151
                                               Fax: (615) 401-6626
                                               christopher.sabis@usdoj.gov

                                               Counsel for the United States