Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.
Wynn Sims on 12/07/2012                                    Page 1

```
 1   STATE OF SOUTH CAROLINA )  IN THE COURT OF COMMON PLEAS
                             )
 2   COUNTY OF OCONEE        )

 3
                                )
 4   Russell A. Reynolds,       )
     III, Individually, and as  )
 5   Personal Representative     )
     of the Estate of Dorothy    )
 6   L. Reynolds, Deceased,      )
                                )
 7            Plaintiff,         )
                                )   CIVIL ACTION
 8        vs.                    )
                                )   FILE NO. 12-CP-37-163
 9   Sava Senior Care, LLC       )
     (a/k/a SavaSeniorCare,      )
10   LLC; SSC Equity Holdings,   )
     LLC (a/k/a Sava Senior      )
11   Care Equity Holdings,       )
     LLC); Seneca Operating      )
12   Company, LLC (a/k/a SSC     )
     Seneca Operating, LLC)      )
13   d/b/a Seneca Health and     )
     Rehabilitation Center;      )
14   Sava Senior Care            )
     Administrative Services,    )
15   LLC (a/k/a SavaSeniorCare   )
     Administrative Services,    )
16   LLC and SSC                 )
     Administrative Services,    )
17   LLC); H. Paul Schrank,      )
     II; and Carolina            )
18   Nutrition Consultants,      )
     Inc.,                       )
19                               )
              Defendants.        )
20                               )

21

22

23

24

25
```

EXHIBIT
60
PENGAD 800-631-6989

Huseby, Inc.                          www.huseby.com
555 North Point Center, E., #403, Alpharetta, GA 30022    (404) 875-0400

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                                    Pages 2..5

Page 2

```
 1              WYNN SIMS

 2

 3         Videotaped deposition of WYNN SIMS, taken

 4    on behalf of the Plaintiff, pursuant to the

 5    stipulations agreed to herein, before Whitney S.

 6    Guynes, Certified Court Reporter at the offices

 7    of Womble, Carlyle, Sandridge & Rice, LLP, 271

 8    17th Street, NW, Suite 2400, Atlanta, Georgia,

 9    on the 7th day of December, 2012, commencing at

10    the hour of 2:04 p.m.

11

12

13

14

15

16

17

18

19

20

21

22

23                    * * *

24

25
```

Page 3

```
 1              A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3         MR. KEN CONNOR (Via Telephone)
           Connor & Connor, LLC
 4         224 Park Avenue SE
           Aiken, SC  29801
 5         (803) 226-0543 (T)
           (800) 480-9175 (F)
 6
           MR. RAY PAUL MULLMAN, JR. (Via Telephone)
 7         Poliakoff & Associates, P.A.
           215 Magnolia Street
 8         Spartanburg, SC 29306
           (864) 582-5472 (T)
 9         (800) 582-7280 (F)
           email: atty@gpoliakoff.com
10
      FOR THE DEFENDANTS, SAVA SENIOR CARE, LLC, SSC
11    HOLDINGS, LLC, and the witness, MS. WYNN SIMS:

12         MR. BENJAMIN R. OGLETREE
           Proskauer, Rose, LLP
13         1001 Pennsylvania Avenue, NW
           Suite 400 South
14         Washington, D.C.  20004-2533
           (202) 416-5814 (D)
15         (202) 416-6899 (T)
           email: bogletree@proskauer.com
16
           MS. SANDRA MILLER (Via Telephone)
17         MS. CATHERINE WRENN (Via Telephone)
           Womble, Carlyle, Sandridge & Rice, LLP
18         550 South Main Street
           Suite 400
19         Greenville, SC 29601
           (864) 255-5400 (T)
20         (864) 255-5440 (F)
           email: samiller@wcsr.com
21

22

23

24

25
```

Page 4

```
 1    FOR THE DEFENDANTS; SENECA OPERATING COMPANY, LLC and
      H. PAUL SCHRANK, II:
 2
           MS. LORI D. PROCTOR
 3         Serpe, Jones, Andrews
                Callender & Bell, PLCC
 4         Three Allen Center
           333 Clay Street, Suite 3485
 5         Houston, Texas  77002
           (713) 452-4400 (T)
 6         (713) 452-4499 (F)
           email: ldproctor@proctor-law.com
 7
           MR. JAY DAVIS
 8         Young, Clement, Rivers, LLP
           25 Calhoun Street
 9         Suite 400
           Charleston, SC  29401
10         (843) 720-5406 (T)
           (843) 579-1355 (F)
11         email: jdavis@ycrlaw.com

12    FOR THE DEFENDANT, CAROLINA NUTRITION CONSULTANTS,
      INC.:
13
           MS. ANNE CULBREATH (Via Telephone)
14         Turner, Padget, Graham & Laney, P.A.
           200 East Broad Street
15         Suite 250
           Greenville, SC  29601
16         (864) 552-4600 (T)
           (864) 52-4620 (F)
17         email: aculbreath@turnerpadget.com

18

19    ALSO PRESENT: MR. DAMON OKORO -- VIDEOGRAPHER

20

21                        * * *

22

23

24

25
```

Page 5

```
 1              D I S C L O S U R E

 2

 3         (Pursuant to O.C.G.A. Section 9-11-28(a) and

 4    (d) and Section 15-14-37(a), (b), and (c), I, Whitney

 5    S. Guynes, Certified Court Reporter, am disclosing on

 6    the record that I have no contractual relationship or

 7    agreement with any attorney, party in this case or

 8    reporting agency from whom a referral might have been

 9    made to cover this deposition.)

10

11

12

13                    * * *

14

15

16

17

18

19

20

21

22

23

24

25
```

Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.
Wynn Sims on 12/07/2012                                           Pages 6..9

**Page 6**

```
 1              I N D E X
 2
 3        WITNESS: WYNN SIMS
 4
 5    EXAMINATION                           PAGE
 6
 7    By Mr. Connor: ................................9
 8    By Mr. Ogletree: .............................75
 9
10
11                    * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 7**

```
 1          S T I P U L A T I O N S
 2        VIDEOGRAPHER:  This is the beginning of
 3    Disk Number 1 in the deposition of Wynn Sims in
 4    the matter of Russell A. Reynolds, III, et al
 5    vs. Sava Senior Care, LLC et al, Case
 6    Number 12-CP-37-163.
 7        Today's date is December 7th, 2012, and
 8    the time on the monitor is 2:04 p.m.  My name is
 9    Damon Okoro.  I'm the videographer.  The court
10    reporter is Whitney Guynes.  We're here with
11    Huseby Court Reporting.
12        Counsel, please introduce yourselves,
13    after which the reporter will swear in the
14    witness.
15        MR. OGLETREE:  My name is Ben Ogletree.
16    I'm with Proskaur, Rose in Washington, D.C., and
17    I'm here on behalf of the witness, Wynn Sims,
18    and I also represent Defendant, Sava Senior
19    Care, LLC and SSC Equity Holdings, LLC.
20        MS. PROCTOR:  Lori Proctor on behalf of
21    Seneca Operating Company and the individual
22    Defendants associated.
23        MR. CONNOR:  Ken Connor on behalf of the
24    Plaintiff.  And Ray Mullman is also on the line
25    on behalf of the plaintiff, as well.
```

**Page 8**

```
 1        All right.  Would the court reporter
 2    please swear the witness?
 3        (Witness sworn.)
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 9**

```
 1    WHEREUPON:
 2                WYNN SIMS,
 3    having been first duly sworn, was examined and
 4    testified as follows:
 5                EXAMINATION
 6    BY MR. CONNOR:
 7        Q    Good afternoon, Ms. Sims.  My name is Ken
 8    Connor.  I represent the Plaintiff in this proceeding.
 9    And under the South Carolina Rules of Civil Procedure,
10    I'm obliged to instruct you that in the event you have
11    any questions about the questions I'm asking or if you
12    need any clarification, definitions, explanations of
13    any words, questions or documents that are presented
14    during the course of the deposition, please address
15    those questions to me rather than your own counsel.
16        Do you understand that?
17        A    Yes, sir.
18        Q    Okay.  Thank you very much.
19        Would you please state your name for the
20    record?
21        A    Wynn Sims.
22        Q    And is that spelled, W-Y-N-N?
23        A    Yes, sir.
24        Q    Where do you live, Ms. Sims?
25        A    Atlanta, Georgia.
```

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                              Pages 10..13

1    Q    Okay.  By whom are you employed?
2    A    Sava Senior Care Administrative Services,
3 LLC.
4         Q    And in what capacity are you employed with
5 that organization?
6    A    Senior Paralegal.
7    Q    How long have you worked for Sava Senior
8 Care Administrative Services, LLC?
9    A    Since January, 2005.
10    Q    Okay.  Have you ever worked for any other
11 Sava-related entity?
12    A    I've never been employed by any other Sava
13 entity, no.
14    Q    Okay.  Have you ever been employed by any
15 Mariner-related entity?
16    A    Yes.  I was employed by Mariner Health
17 Care Management Company.
18    Q    Okay.  And then I assume that after the
19 merger you went to work for Sava Administrative
20 Services.
21    A    Merger?
22         MR. OGLETREE:  Can you be more specific?
23 BY MR. CONNOR:
24    Q    Sure.
25         After the merger between Mariner into and

1 with National Senior Care, did you go to work for Sava
2 Administrative Services?
3    A    Yes, Sava Senior Care Administrative
4 Services.  That's correct.
5    Q    Okay.  So would you have gone from a
6 Mariner organization to Sava Administrative Services
7 without any gap in your employment?
8    A    That's correct.
9    Q    Okay.  And what do your duties as Senior
10 Paralegal involve, please, for Sava Administrative
11 Services?
12    A    I maintain corporate records for the
13 companies that Sava Senior Care Administrative
14 Services, LLC provides back office services for,
15 approximately 240 legal entities.
16         I make sure that the companies are
17 maintained in good standing with their state of
18 formation, any states of qualification.  If they have
19 any specific trade name filing requirements, if anyone
20 requires legal documents like a Good Standing
21 Certificate, I will procure those.
22         I work on special projects with the
23 general counsel reviewing documents.  I assist with
24 litigation, if the litigation attorney needs
25 assistance.  I maintain a corporate database that has

1 officer and director information, formation dates.
2 That's the bulk.  Things change differently, but
3 that's mostly what I do on a daily basis.
4    Q    Who is your supervisor, your immediate
5 supervisor?
6    A    Stefano Miele.
7    Q    And has he been your supervisor ever since
8 you went to work for Sava Administrative Services,
9 LLC?
10    A    Yes, sir.
11    Q    All right.  And you've indicated that you
12 perform work for, I believe you indicated, 240
13 different legal entities; is that correct?
14    A    Approximately, yes.
15    Q    Okay.  And I'm not going to ask you to
16 name all those entities, but would they include all of
17 the operating subsidiaries that operate nursing homes?
18    A    Yes, sir.
19    Q    Okay.  And what other kinds of entities,
20 besides those, would you perform services for within
21 the Sava umbrella?
22    A    There are some entities that are limited
23 partnerships.  They have general partners, so I would
24 prepare the documents for those companies and would
25 file their annual registrations with the Secretary of

1 State's Office.  If there are any officer changes,
2 I'll draft those as a board consent.
3    Q    You perform work for Canyon Sudar
4 Partners, LLC?
5    A    I do not.
6    Q    SVCARE Holdings, LLC?
7    A    No, sir.
8    Q    Sava Senior Care, LLC?
9    A    Yes.
10    Q    SSC Equity Holdings, LLC?
11    A    Yes.
12    Q    Seneca Operating, LLC?
13    A    SSC Seneca Operating Company, LLC, yes.
14    Q    Thank you for that clarification.
15         Now, and so how many operating
16 subsidiaries do you perform work for?  And by that,
17 when I say "operating subsidiaries", I'm referring to
18 entities that operate nursing homes within -- under
19 the Sava umbrella?
20    A    Approximately 183, I believe.
21    Q    Okay.  So that's gonna leave roughly 57
22 other entities that you perform work for; is that
23 right?
24    A    Yes, sir.  Those were the GP LLCs that I
25 was referring to, the general partners of the limited

Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.
Wynn Sims on 12/07/2012                                    Pages 14..17

Page 14

1  partnership operating companies.
2      Q     Okay.  Now, where are you based?  Where do
3  you work out of?
4      A     One Ravinia Drive, Suite 1500, Atlanta.
5      Q     And are -- does more than one Sava-related
6  entity operate out of that same address?
7      A     No, only Sava Senior Care Administrative
8  Services, LLC.
9      Q     Okay.  Now, are there any other
10 Sava-related entities that operate out of One Ravinia
11 Drive?
12     A     Not that operate, no.
13     Q     You've qualified it.  Are there any other
14 Sava-related entities that are housed, receive mail,
15 phone calls or any other kinds of -- engage in any
16 other kinds of activity at One Ravinia Drive?
17     A     Yeah, some of the companies that you
18 mentioned earlier have a mailing address at that same
19 One Ravinia Drive address.
20     Q     And what would they include?
21     A     Sava Senior Care, LLC and SSC Equity
22 Holdings, LLC.
23     Q     And who opens the mail for SSC Equity
24 Holdings, LLC?
25     A     If something is from a Secretary of

Page 15

1  State's office, it would be directed to me.  I don't
2  know if that company receives other mail, who it would
3  be directed to.
4      Q     Okay.  Who receives telephone calls on
5  behalf of SSC Equity Holdings, LLC?  Who fields
6  telephone calls?
7      A     I don't know that it has a phone number.
8  If anyone was calling the office at One Ravinia Drive
9  it would go through the main switchboard, I would
10 think.
11     Q     Okay.  Thank you.
12           And so what is the number for the main
13 switchboard there?
14     A     I think it's (770)829-5100.  Sorry, I have
15 a direct line, so I don't call the switchboard.
16     Q     No, I understand, that's fine.
17           But is that the number that typically
18 would be called in order to be routed to one or the
19 other Sava-related entities?
20     A     I believe so, yes.
21     Q     Okay.  So, for example, if the State of
22 South Carolina was calling and had a question about
23 the Medicare cost report that had been filed on behalf
24 of SSC Equity, LLC, would they typically call the main
25 switchboard?

Page 16

1      A     I don't know.
2      Q     If they called the main switchboard and
3  asked to speak to either you or Mr. Stenger, would the
4  caller be able to be routed to you through that
5  switchboard?
6      A     Yes, sir.
7      Q     Okay.  And did I understand you to say
8  that SSC Equity Holdings, LLC would receive mail at
9  that address?
10     A     Yes.
11     Q     Okay.  Now, at that address, that is One
12 Ravinia Drive, and did you say the 15th floor?
13     A     Yes, Suite 1500.
14     Q     Suite 1500.  Does Suite 1500, does that
15 occupy the entire floor?
16     A     Yes, sir.
17     Q     Okay.  And are there any signs -- what is
18 the sign on the outside of the door or the entrance to
19 Suite 1500?  What does that indicate, if anything?
20     A     It says, Welcome to Sava Senior Care
21 Administrative Services, LLC.
22     Q     Okay.  And within that suite of offices,
23 as I understand it, you perform services on behalf of
24 a variety of different entities, correct?
25     A     Yes.

Page 17

1      Q     You don't move from that office location
2  to provide any services on behalf of any of the other
3  entities, typically, do you, in the course of your
4  normal --
5      A     No.
6      Q     Okay.  So for instance, if you do work for
7  Sava Senior Care Administrative -- do you have an
8  office, ma'am, a separate office --
9      A     Yes, I do.
10     Q     -- within that suite?
11     A     Yes.
12     Q     Okay.  And so for instance, when you
13 perform work on behalf of Sava Senior Care
14 Administrative Services, LLC, you perform it within
15 that office?
16     A     Yes, sir.
17     Q     And would the same be true for anything
18 that you do on behalf of SSC Equity Holdings, LLC?
19     A     Yes.
20     Q     And would the same be true for any work
21 that you do on behalf of Seneca Health and
22 Rehabilitation Center?
23     A     For the company, yes.
24     Q     The company that --
25     A     For SSC Seneca Operating Company, LLC,

Huseby, Inc.                                    www.huseby.com
555 North Point Center, E., #403, Alpharetta, GA 30022      (404) 875-0400

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                                    Pages 18..21

Page 18

```
1   yes.
2        Q      Okay.  And do you perform work, for
3   instance, on behalf of SSC Sumpter East Operating
4   Company, LLC?
5        A      Yes, sir.
6        Q      And whatever work that you perform on its
7   behalf, do you do it out of that same office?
8        A      Yes, sir.
9        Q      Okay.  Now, in that -- within that suite,
10  are there any kinds of signage that indicate separate
11  areas for any of the Sava-related entities that we've
12  talked about?
13       A      No.
14       Q      Okay.  So there is simply a sign on the
15  outside that says, Welcome to Sava Administrative --
16              MR. OGLETREE:  Objection.
17              MR. CONNOR:  -- Services, LLC?
18              MR. OGLETREE:  Objection to --
19              MR. CONNOR:  -- and nothing further that
20          denominates areas that are devoted to the work
21          of any of the other Sava entities; is that
22          correct?
23              MR. OGLETREE:  Withdraw it.
24              THE WITNESS:  Yes, that is correct.
25  BY MR. CONNOR:
```

Page 19

```
1        Q      Okay.  Thank you.
2               Now, do you have a work e-mail address?
3        A      I do.
4        Q      And what is it, please?
5        A      Wgsims@savasc.com.
6        Q      Is savasc.com the domain name that's
7   used for all of the Sava-related entities?
8        A      Domain name for people receiving e-mail?
9        Q      Yes.
10       A      I believe so.
11       Q      So, for example, would -- if an e-mail was
12  sent to somebody that was affiliated with the Seneca
13  Health and Rehabilitation, would they have that same
14  domain name as part of their e-mail address?
15       A      That I do not know 100 percent to answer,
16  sorry.
17       Q      Okay.  Do you know whether folks that work
18  at Sumpter East Health and Rehabilitation Center have
19  that same domain name as a component of their work
20  e-mail address?
21              MR. OGLETREE:  Objection.
22              THE WITNESS:  I'm not sure, I'm sorry.
23  BY MR. CONNOR:
24       Q      If you don't know, that's all right.
25       A      Okay.
```

Page 20

```
1        Q      Just feel free to say you don't know.
2               Now, who -- do you receive a paycheck?
3        A      I do.  Well, a direct deposit.
4        Q      Okay.  And what kind of notification or
5   memoranda do you receive about that deposit?
6        A      I receive an e-mail pay stub.
7        Q      Okay.  And who -- do you know who deposits
8   those funds directly to your account?
9        A      Sava Senior Care Administrative Services,
10  LLC.
11       Q      Do you know if that's who the dispersing
12  agent is?
13       A      No, the dispersing agent is SSC
14  Disbursement Company.
15       Q      Okay.  And do you know where the funds are
16  on deposit that are deposited into your account?  And
17  when I say where, I'm really referring to the account
18  holder.
19       A      No, sir.
20       Q      Do you receive a W-2 at the end of the
21  year?
22       A      Yes, sir.
23       Q      I'm sorry, I couldn't hear you.
24       A      Oh, I'm sorry.  Yes, sir.
25       Q      And who is identified as your employer on
```

Page 21

```
1   your W-2?
2        A      Sava Senior Care Administrative Services,
3   LLC.
4        Q      Now, you've indicated that you perform
5   services for 240 separate legal entities.  Do you keep
6   track of your time for the work that you perform on
7   behalf of any given entity?
8        A      No, I do not.
9               MR. OGLETREE:  Ken, I'm sorry, just to
10          clarify, are you asking in terms of the work she
11          performs in her role as a paralegal in
12          Administrative Services?  Is that the question?
13              MR. CONNOR:  That's right.
14              MR. OGLETREE:  Okay.
15              MR. CONNOR:  Does that change your answer
16          at all?
17              THE WITNESS:  No, sir.
18  BY MR. CONNOR:
19       Q      Okay.  Now, are you, in addition to
20  serving as a paralegal at Sava Administrative
21  Services, are you an officer or director at any other
22  Sava-related entity?
23       A      Yes.
24       Q      Okay.  And would you tell us for what
25  entities and what role you serve in for that entity?
```

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                                    Pages 22..25

**Page 22**

1       A    I'm the Assistant Corporate Secretary of
2    Sava Senior Care, LLC, and I'm the Corporate Secretary
3    for Sava Senior Care Administrative Services, LLC, SSC
4    Equity Holdings, LLC, SSC Seneca Operating Company,
5    LLC, and all of the other operating company LLCs.
6       Q    And did I understand that for those
7    operating companies and including SSC Equity Holdings?
8       A    That's correct.
9       Q    That you are the Corporate Secretary?
10      A    Yes, sir.
11      Q    Now, when you perform any work on behalf
12   of SSC Equity Holdings -- and just for ease of
13   discussion, I'm going to drop the LLC designation.
14   But if you have any confusion about what I'm asking
15   about, don't hesitate to ask me.  Okay?
16      A    Okay.
17      Q    When you perform work on behalf of SSC
18   Equity Holdings, for example, in your role as
19   Corporate Secretary, are you paid for those services
20   by SSC Equity Holdings?
21      A    No, sir.
22      Q    Do you keep track of your time for the
23   work that you perform on behalf of SSC Equity
24   Holdings?
25      A    No, sir.

**Page 23**

1       Q    Do you keep track of your time for any of
2    the work that you perform in your role as Corporate
3    Secretary for the entities you've identified?
4       A    No.
5       Q    Okay.  Pardon?
6       A    No, I do not.
7       Q    Okay.  And did I understand you to say
8    that you are the Assistant Corporate Secretary for
9    Sava Senior Care, LLC?
10      A    That's correct.
11      Q    And what kind of work do you perform on
12   behalf of Sava Senior Care, LLC?
13      A    I file --
14      Q    In that role as Corporate Secretary.
15      A    Yes, sir.  I file the annual report form
16   with the states of Delaware and Georgia.  If a
17   corporate officer's signature, president, vice
18   president, et cetera, requires any type of
19   attestation, I can attest their signature.
20           If there are any documents like a Board
21   Consent that requires filing in a minute book, I will
22   do that, and I will assist the general counsel's
23   office with obtaining signatures on documents.
24      Q    Now, when you perform work of that sort,
25   do you keep track of your time on behalf of Sava

**Page 24**

1    Senior Care?
2       A    I do not, no.
3       Q    Are you compensated directly in any way by
4    Sava Senior Care?
5       A    Sava Senior Care, LLC, no, I am not.
6       Q    Now, in addition to serving -- so, have
7    you identified -- by identifying your role as
8    Corporate Secretary, have you identified all of the
9    entities for whom you've served as Corporate
10   Secretary?
11      A    The operating company LLCs that are
12   indirect subsidiaries of Sava Senior Care, LLC, and
13   the SSC Operating GP LLCs that are the general partner
14   of the limited partnerships.
15      Q    Okay.  And then do you serve in any other
16   office other than Corporate Secretary or Assistant
17   Corporate Secretary for any Sava-related entity?
18      A    Are there -- I don't understand.  Are
19   there other companies that I haven't named?  Is that
20   your question?
21      Q    What I'm really trying to understand is
22   did you hold any other office other than Corporate
23   Secretary or Assistant Corporate Secretary for any
24   Sava-related entity?
25      A    Oh, sorry.  No, sir, I don't.

**Page 25**

1       Q    All right.  Do you serve as a director of
2    any Sava-related entity?
3       A    No, I do not.
4       Q    Or as a member of any Sava-related entity?
5       A    No, I do not.
6       Q    Okay.  Are you a participant in a pension
7    or profit-sharing plan?
8       A    No, sir.
9       Q    Are you eligible for participation in any
10   such kind of plan?
11      A    I'm eligible to participate in a 401K
12   plan.
13      Q    Okay.  And do you participate in a 401K
14   plan?
15      A    I do.
16      Q    All right.  And who is the company that
17   provides the employer's share of the contribution?
18      A    I've never received an employer's share.
19      Q    So in your 401K plan are you the only
20   person who makes contributions to that plan?
21      A    Yes, sir.
22      Q    Do you know who administers that plan?
23      A    Fidelity Investments.  Is that who I get
24   the statements from?
25      Q    I will accept that you get it from

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
Wynn Sims on 12/07/2012                                    Pages 26..29

Page 26

1   Fidelity; is that correct?
2       A    Yes.
3       Q    All right.
4            MR. OGLETREE:  But do you know the answer
5   to that question or are you guessing?
6            THE WITNESS:  If by administrator it means
7   who has the money and makes the investments,
8   then Fidelity Investments is who -- is the
9   answer to that.
10  BY MR. CONNOR:
11      Q    Usually I think he refer to that as the
12  custodian of the fund?
13      A    Okay.
14      Q    And so we'll accept an amendment to your
15  answer, if that's the case, but do you know if that
16  plan is administered by anyone other than Fidelity?
17      A    Not that I'm aware of.
18      Q    And just so that I -- I want to make sure
19  that I understand.  Does 100 percent of your
20  compensation come from Sava Administrative Services?
21      A    Yes, sir.
22      Q    No part of your compensation, as I
23  understand it, comes from any Sava Operating
24  subsidiary, even though you perform services on their
25  behalf, correct?

Page 27

1       A    That's correct.
2       Q    And no part of your compensation comes
3   from SSC Equity Holdings, even though you perform
4   services on their behalf, correct?
5       A    That's correct.
6       Q    And no part of your compensation comes
7   from Sava Senior Care, LLC, even though you perform
8   services on its behalf?
9       A    Correct.
10      Q    Okay.
11           (Telephone beeps.)
12           MR. OGLETREE:  Is somebody dialing in?  Is
13  that somebody joining us?  I've heard the beep
14  several times.
15           MR. CONNOR:  I don't think so, Ben.
16           MR. OGLETREE:  Okay.
17           MR. CONNOR:  I think when a line at this
18  office rings in we get an interruption.  I'm
19  sorry, I don't know how to avoid that.
20           MR. OGLETREE:  That's okay.  I'm sorry
21  Mr. Connor.  I just thought perhaps it was
22  somebody joining the conference call.  That's
23  all.
24           MR. CONNOR:  I don't think so.
25           MR. OGLETREE:  Okay.

Page 28

1   BY MR. CONNOR:
2       Q    Let me ask you some questions, if I may,
3   that you may have knowledge by virtue of the
4   different hats that you wear in connection the --
5            COURT REPORTER:  I didn't hear him.
6            MS. PROCTOR:  I'm sorry, Ken, we didn't
7   hear you.  In connection with what?
8            MR. CONNOR:  The Sava-related entity.
9   Would you like me to restate?
10           MR. OGLETREE:  Yes, please.
11  BY MR. CONNOR:
12      Q    Okay.  I'd like to ask you some questions
13  about which you may have knowledge by virtue of the
14  different hats that you wear with various Sava-related
15  entities.  Okay?
16           First of all, you told us that you serve
17  as -- I think you said the Corporate Secretary for
18  Sava Senior Care, LLC?
19           MR. OGLETREE:  Object.
20           THE WITNESS:  Assistant.
21  BY MR. CONNOR:
22      Q    Assistant?
23      A    Yes.
24      Q    Thank you for that clarification.
25           Do you know if there is an entity known as

Page 29

1   Sava Senior Care, Incorporated?
2       A    Not that I'm aware of.
3       Q    Okay.  Does Sava Senior Care, LLC have
4   directors?
5       A    Yes, sir.
6       Q    And who are the directors?
7       A    Tony Oglesby, Murray Forman and Leonard
8   Grunstein.
9       Q    And what was Tony's last name?  I'm sorry.
10      A    Oglesby, O-G-L-E-S-B-Y.
11      Q    Okay.  Thank you.
12           And does Sava Senior Care Administrative
13  Services have directors?
14      A    Yes.
15      Q    And who are those directors?
16      A    Tony Oglesby, Kevin Seramur and Stefano
17  Miele.
18      Q    And let me go back.  Oglesby, Forman and
19  Grunstein are directors of which entity you mentioned?
20      A    Sava Senior Care, LLC.
21      Q    And the last three that you gave me are --
22      A    Sava Senior --
23      Q    -- directors of which entity?
24      A    Sava Senior Care Administrative Services,
25  LLC.

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                                    Pages 30..33

### Page 30

1    Q    All right. That was Seramur? How do you
2  pronounce that?
3    A    It's Kevin, S-E-R-A-M-U-R.
4    Q    And how do you pronounce his last name?
5    A    Seramur.
6    Q    And who were the other directors of Sava
7  Senior Care Administrative Services?
8    A    Stefano Miele, M-I-E-L-E.
9    Q    Seramur, Miele, and was there one other?
10   A    Oglesby, Mr. Oglesby.
11   Q    Okay. And what about SSC Equity Holdings,
12  does it have directors?
13   A    One director, Murray Forman.
14   Q    And when you identify him as a director,
15  you're making a distinction, I assume, between a
16  member and a director?
17   A    A member is -- because these are LLCs, the
18  member is who actually owns the membership interest in
19  the entity, so it's not an individual.
20   Q    I understand.
21   A    Yes.
22   Q    And so you're using the term "director" in
23  contrast to member, correct?
24   A    They're not -- it's a separate -- it's a
25  separate position or -- it's not one and the same.

### Page 31

1    Q    Right. Thank you.
2         That's what I'm trying to establish.
3    A    Okay. Yes.
4    Q    So the director of SSC Equity Holdings is
5  who?
6    A    Murray Forman.
7    Q    And does Seneca Operating, LLC have a --
8  have directors?
9    A    One director.
10   Q    And who is that?
11   A    Paul Schrank, S-C-H-R-A-N-K.
12   Q    Thank you.
13        Do you know whether or not SVCARE
14  Holdings, LLC has directors?
15   A    I don't know.
16   Q    Do you know whether Canyon Sudar Partners,
17  LLC has directors?
18   A    No, sir.
19   Q    No, you don't know?
20   A    No, I do not know.
21   Q    Okay. Thank you.
22        Can you tell me who the officers of Sava
23  Senior Care, LLC are?
24   A    Yes, Tony Oglesby is the President and
25  Chief Executive Officer. Kevin Seramur is an

### Page 32

1  Executive Vice President and Chief Financial Officer.
2  Stefano Miele is Executive Vice President, General
3  Counsel and Secretary. Scott Barterwell is Executive
4  Vice President and Chief Administrative Officer, and
5  I'm the Assistant Secretary.
6    Q    Okay. And can you tell me who the
7  officers are of SSC Equity Holdings, LLC?
8    A    Murray Forman is President, and I am
9  Secretary.
10   Q    Any other officers?
11   A    No, that's all.
12   Q    And who are the officers for Sava Senior
13  Care Administrative Services?
14   A    Tony Oglesby is President. Kevin Seramur
15  is the Chief Financial Officer, Stefano Miele is
16  Executive Vice President. I am Corporate Secretary.
17  Janice Martinez is a Senior Vice President of Finance.
18  Tom Simons is a Senior Vice President of Finance.
19  Brent Snelgrove is a Senior Vice President and Chief
20  Compliance Officer. Chris Stenger is Vice President
21  Reimbursement. Scott Barterwell is Executive Vice
22  President of Risk Management. That's all I can
23  remember off the top of my head. There may be a few
24  more --
25        You're doing a better job than I can

### Page 33

1  remember with all my grandchildren. Thank you.
2         Let's talk about SSC Seneca Operating
3  Company, LLC.
4    A    Okay.
5    Q    Can you tell me who the officers are of
6  that enterprise?
7    A    The President is Paul Schrank. I'm not
8  sure who the Vice President of Operations is, and I'm
9  the Secretary.
10   Q    And do you know who the -- if there are
11  directors of Sumpter East Health And Rehabilitation
12  Center, SSC Sumpter East Operating Company, LLC?
13        MR. OGLETREE: Objection.
14        THE WITNESS: Paul Schrank is the director
15        of that company.
16  BY MR. CONNOR:
17   Q    And do you know who the officers are?
18   A    Paul is President. I don't know who Vice
19  President of Operations is, and I'm the Secretary.
20   Q    Okay. Thank you.
21        Have you ever set foot on the floor of
22  Seneca Health and Rehabilitation Operating Center?
23   A    I have. I've been there one time.
24   Q    When was that?
25   A    About five years ago.

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                                    Pages 34..37

Page 34

1     Q     And so I take it you were not there in
2   2009?
3     A     No, sir.
4     Q     You were not there in 2010?
5     A     No.
6     Q     Nor '11?
7     A     No, sir.
8     Q     Have you ever set foot on the floor of
9   Sumpter East Health and Rehabilitation Center in
10  Sumpter, South Carolina?
11          MR. OGLETREE:  Objection.
12          THE WITNESS:  No, I have not.
13  BY MR. CONNOR:
14    Q     Do you know -- do you recall from your
15  visit to the Seneca facility what, besides -- whose
16  name, besides the name of the -- appeared on the name
17  tags for staff --
18          MR. OGLETREE:  Ken, there was a little
19          break up there in the questioning.  Do you mind
20          please repeating the question?
21          MR. CONNOR:  I'll be happy to.  Thank you.
22  BY MR. CONNOR:
23    Q     Ma'am, other than the name of the staff
24  member that appeared on the name tags of staff members
25  at the Seneca facility when you visited, do you recall

Page 35

1   if any other name was reflected on the name tag?
2     A     I'm sorry, I don't remember.
3     Q     Okay.  Do you recall whether there is any
4   signage or whether or not there was any signage at
5   that facility that you observed when you visited about
6   five years ago?
7     A     I don't remember.
8     Q     Now, does any Sava-related entity, to the
9   best of your knowledge, have any service marks that
10  are on file with the US Patent Office?
11    A     Yes.  Sava --
12    Q     Tell me those, please.
13    A     Sava Senior Care Administrative Services,
14  LLC owns the name, "Sava Senior Care".  It owns a logo
15  that's the letters, "SCS".
16    Q     SC -- what, ma'am?
17    A     SCS like Sam, Charlie, Sam.
18    Q     Thank you.
19    A     And it owns a logo that is like a sunburst
20  and it says "New Day" on it.
21    Q     I think you've identified three separate
22  marks; is that right?
23    A     Yes, sir.
24    Q     Okay.  One is the Sava Senior Care,
25  correct?

Page 36

1     A     Correct.
2     Q     The other was -- did I understand you to
3   say, SCS?
4     A     Yes, sir.  It's a stylized SCS with like a
5   backward "C" or something.
6     Q     Okay.  And were you -- do you know when
7   those -- do you know when the Sava Senior Care
8   Administrative Services applied for protection from
9   the US Patent Office for those marks?  Do you know
10  when they first applied?
11    A     I believe the application for Sava Senior
12  Care was made in 2005, and the SCS was in 2005 and
13  2006, sometime around there, and then the "New Day"
14  logo, I believe, was about three or four years ago.
15    Q     And would you have been involved in filing
16  the application for recognition of the marks with the
17  patent office?
18    A     I was -- that was assigned to outside
19  local counsel and --
20          MR. OGLETREE:  Did you hear his question?
21          Did you do that, was his question.
22          THE WITNESS:  I instructed or requested
23          outside counsel to file the applications on
24          behalf of Sava Senior Care Administrative
25          Services, LLC.

Page 37

1   BY MR. CONNOR:
2     Q     Okay.  Thank you.
3           Now, do you know whether or not there is a
4   license agreement between Sava Care Administrative
5   Services and any other Sava-related entity for the use
6   of the mark, Sava Senior Care?
7     A     Yes, sir, there is.
8     Q     Okay.  Tell me about that.  What do you
9   know about that?
10    A     There is a back office service agreement
11  between Sava Senior Care Administrative Services, LLC
12  and each of the SSC operating company LPs or LLCs, and
13  as part of the Administrative Service Agreement there
14  is a license agreement to use the trademarks.
15    Q     And do you know whether or not there is
16  any such agreement that pertains to the use of the
17  mark, SCS, Sam, Charlie, Sam?
18    A     The stylized logo, yes, is one of the
19  marks they're allowed to use.
20    Q     And it's one of the marks that all of the
21  operating entities are allowed to use?
22    A     Yes, pursuant to their back office service
23  agreement with Sava Senior Care Administrative
24  Services.
25    Q     Okay.  And what about the sunburst with

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                               Pages 38..41

---

Page 38

1    the New Day?
2        A      Yes, sir.
3        Q      Is there a license agreement that you're
4    aware of between Sava Senior Care Administrative
5    Services and the operating entity?
6        A      Yes.  It's also part of the back office
7    service agreement.
8        Q      Okay.  Thank you.
9               That would be true for each; is that
10   right?
11       A      Yes in --
12       Q      In other words -- pardon?
13       A      There is one -- as part of the back office
14   agreement, there is an exhibit that says the operating
15   company is licensed to use each of the trademarks on
16   the following exhibit, and it includes all three of
17   those marks.
18       Q      Thank you.
19              And do you know whether or not any of --
20   if there is any agreement between Sava Senior Care,
21   LLC, and Sava Senior Care Administrative Services,
22   LLC, for the use of any of those three marks?
23       A      Not that I'm aware of.
24       Q      Ma'am, are you in any way involved in any
25   of the handling of cash for any of these facilities?

---

Page 39

1        A      No, sir.
2        Q      Do you have any involvement with or
3    participation in the concentration account into which
4    facility revenues are deposited?
5        A      No, I do not.
6        Q      Do you, in your role as Senior
7    Paralegal -- well, let me go back and ask you this.
8    Did you -- do you know whether or not Mr. Miele
9    performed services on behalf of more than one
10   Sava-related entity?
11       A      I don't know.
12       Q      Well, does he wind up tasking you with
13   your responsibility?
14       A      No.
15              MR. OGLETREE:  Objection to form.
16              THE WITNESS:  No.
17   BY MR. CONNOR:
18       Q      You told me that he's your supervisor.
19   Who tasks you with your responsibilities that you have
20   at Sava Senior Care Administrative Services?
21       A      The filings that I do on behalf of the
22   legal entities is just part of my area of expertise.
23   It's my job.  He's not involved in those types of
24   annual filings at all.
25       Q      So back to my earlier question, I'm sorry.

---

Page 40

1    Do you know -- do you have any knowledge as to whether
2    or not he performs work on behalf of more than one
3    Sava-related entity?
4        A      Not -- in his capacity as an officer of
5    Sava Senior Care, LLC, and of Sava Senior Care
6    Administrative Services, LLC, that's all I -- that's
7    all I know.
8        Q      Okay.  Do you know from whom he receives a
9    paycheck?
10       A      Sava Senior Care Administrative Services.
11       Q      And how is it that you know that?
12       A      That's who he is employed by.
13       Q      Have you ever seen his paycheck?
14       A      No.
15       Q      So is that an assumption that you made?
16       A      No, I know that he -- I know that everyone
17   in the Atlanta office is employed by Sava Senior Care
18   Administrative Services, LLC or Sava Senior Care
19   Consulting, LLC.
20       Q      Who is employed by Sava Senior Care
21   Consulting Company?
22       A      The clinical operations regulatory
23   personnel in the office -- you want names of people?
24       Q      No, that's fine.  Would that be an apt
25   description of the category of people or

---

Page 41

1    classification of people that would be employed by
2    consulting services?
3        A      Yes.
4        Q      Ma'am, are you involved in any way in
5    either generating or serving as custodian of vendor
6    contracts which would be entered into with a given
7    operating subsidiary and a provider of services to
8    those facilities?
9        A      No, I'm not.
10       Q      So that I'm clear on that, for instance,
11   if a medical director enters into a contract with
12   Seneca Health and Rehabilitation Center or if a food
13   vendor provides services to them or a therapy company
14   provides services to them, you have nothing to do with
15   that at all; is that right?
16       A      That is correct.
17       Q      All right.  Do you know where such
18   contracts would be maintained or kept on file?
19       A      I don't have enough knowledge to answer
20   that question.  I could guess, but I don't know.
21       Q      That's all right.
22       A      Yeah, I don't know.
23       Q      Okay.
24       A      I do not maintain them.
25       Q      All right.  Okay.  Do you know who does --

---

Huseby, Inc.                                    www.huseby.com
555 North Point Center, E., #403, Alpharetta, GA 30022     (404) 875-0400

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**        **Pages 42..45**

Page 42

1  do you know who the records custodian would be?
2     A     There is a contract paralegal that works
3  for Sava Senior Care Administrative Services, LLC --
4  she actually works out of her home in Virginia, and
5  she reports to Stefano Miele.  And then I believe she
6  works directly with the facility on contract-related
7  matters.
8     Q     Who would that contract paralegal be
9  today?
10    A     Susan Gray.
11    Q     G-R-A-Y?
12    A     Yes.
13    Q     Okay.  And do you know where -- what town
14  her home is located in, in Virginia?
15    A     I do not.  She's recently moved.
16    Q     What role, if any, do you play with
17  respect to Sava Consulting Services, LLC?
18    A     I'm the secretary.
19    Q     And what duties do you perform on its
20  behalf?
21    A     The same.  I file the annual report with
22  the Secretary of State's Office and maintain a copy of
23  the Certificate of Formation, Limited Liability
24  Company Agreement, just --
25    Q     And what -- I'm sorry.  I didn't mean to

Page 43

1  cut you off.
2     A     No, that's all right.  It doesn't sound
3  like -- that's about it.
4     Q     Okay.  And what do you understand Sava
5  Consulting Services -- what do you understand its role
6  to be vis a vis the operating subsidiary in contrast
7  to the role of Sava Administrative Services?
8     A     There are consulting agreements between
9  Sava Senior Care Consulting, LLC and each one of the
10  SSC operating companies, and the consulting services
11  company provides consulting services with respect to
12  clinical, regulatory issues, more in-the-field type of
13  consulting services, whereas administrative services,
14  truly back office services like legal and finance,
15  that type of thing.
16    Q     Okay.  Without the services provided by
17  Sava Administrative Services and Consulting Services,
18  would the facilities be able to operate their
19  day-to-day operations?
20          MR. OGLETREE:  Objection.
21          THE WITNESS:  I have no idea.  I would
22  think so.
23  BY MR. CONNOR:
24    Q     And what causes you to think that they
25  could?

Page 44

1     A     Because we're not in the facility, in
2  person, to provide services that would be required to
3  operate a nursing home 24 hours a day.
4     Q     What role, if any, does Sava
5  Administrative Services, to your knowledge, play with
6  respect to budgeting for a given operational entity?
7     A     I'm not aware of any.
8     Q     You don't play any role in that regard, is
9  that fair?
10    A     That's correct.
11    Q     Okay.
12          MR. OGLETREE:  I'm going to withdraw my
13  earlier objection.
14  BY MR. CONNOR:
15    Q     Let me ask you to -- I'd like to now ask
16  you, Ms. Sims, if I may, about an affidavit that has
17  been filed in this proceeding which indicates that
18  it's an affidavit of Wynn G. Sims on behalf of SSC
19  Equity Holdings, LLC that's for a Motion to Dismiss.
20          Do you recall executing that affidavit?
21    A     Yes, sir, I do.
22    Q     Do you have a copy of it available to you?
23          MR. OGLETREE:  Not here in front of her,
24  no.
25          MR. CONNOR:  Okay.  That's all right.

Page 45

1  BY MR. CONNOR:
2     Q     Let me ask you some questions about that
3  affidavit, and I'll read to you the pertinent portion
4  of it that I want to ask you about.  Okay?
5     A     Okay.
6     Q     Paragraph 3 of that affidavit makes these
7  statements:  It says, "SSC Seneca Operating Company,
8  LLC's sole member is SSC Submaster Holding, LLC, which
9  is a Delaware Limited Liability Company."
10          How is it that you came about that
11  information?  In other words, how is it that you came
12  to know that the sole member of SSC Seneca Operating,
13  LLC was SSC Submaster Holding?
14    A     It is in the Limited Liability Company
15  Agreement, which is maintained in the corporate
16  records that I maintain, and I've seen a copy of the
17  Membership Certificate, which is also in the book.
18    Q     Okay.  And then you make the statement,
19  "SSC Submaster Holding, LLC's sole member is SSC
20  Equity Holdings, LLC, which is a Delaware Limited
21  Liability Company."
22          Same question, how is it that you've come
23  about with knowledge of that information?
24    A     From reviewing the Limited Liability
25  Company Agreement and a copy of the Membership

Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.
Wynn Sims on 12/07/2012                                    Pages 46..49

Page 46

1  Certificate and inputting that into my legal database
2  of companies.
3        Q     Okay.  So is it your understanding then
4  that SSC Equity Holdings, LLC is an indirect owner of
5  SSC Seneca Operating Company, LLC?
6        A     Indirect.  That's correct, indirect.
7        Q     Then as I further read your affidavit, it
8  indicates, SSC Equity Holdings, LLC's sole member is
9  Sava Senior Care, LLC, which is a Delaware Limited
10 Liability Company.
11             And I assume that the basis for that
12 information is the same as you've already described?
13       A     Yes, sir, that's correct.
14       Q     All right.  And would it be fair to say
15 that your understanding is also that Sava Senior Care,
16 LLC is an indirect owner of SSC Submaster -- I'm
17 sorry, let me rephrase.  Would it be fair to say,
18 then, that your understanding is that Sava Senior
19 Care, LLC is an indirect owner of SSC Seneca Operating
20 Company, LLC?
21       A     Correct.
22       Q     As well as an indirect owner of SSC Equity
23 Holdings, LLC?
24       A     It's the direct owner of SSC Equity
25 Holdings, LLC.

Page 47

1        Q     Thank you for making that distinction.
2              (Phone rings.)
3              MR. CONNOR:  I'm sorry.  I'm trying to cut
4  this other phone off.  I apologize for that.
5  BY MR. CONNOR:
6        Q     All right.  Now, in Paragraph 2 of the
7  affidavit about which we spoke, you make the --
8              MR. OGLETREE:  Hey, Ken, would you give us
9  just one second?  We're having a little
10 technical difficulty here.
11             MR. CONNOR:  Of course.
12             MR. OGLETREE:  I'm sorry.  Just a moment,
13 please.  Can you hear the microphone now, sir?
14             VIDEOGRAPHER:  (Nods head affirmatively.)
15             MR. OGLETREE:  Okay.
16             THE WITNESS:  Sorry about that.
17             MR. OGLETREE:  Okay.  We're all set.
18             MR. CONNOR:  Thank you.
19             MR. OGLETREE:  Ken, we're ready if you'd
20 like to ask the question.  We're all -- I think
21 we've got everything in working order again.
22 BY MR. CONNOR:
23       Q     Thank you.
24             Let me direct your attention to
25 Paragraph 2 of the affidavit of which we spoke, which

Page 48

1  reads as follows:  Quote, "SSC Equity Holdings, LLC
2  observes corporate formalities.  SSC Equity Holdings,
3  LLC maintains its own books and records", close quote.
4              Do you recall having sworn to the truth of
5  that statement?
6        A     Yes, sir.
7        Q     Okay.  And how does SSC Equity Holdings --
8  well, strike that.
9              Does SSC Equity Holdings have any
10 employees?
11       A     No.
12       Q     Then how does SSC Equity Holdings maintain
13 its own books and records?
14       A     As the Corporate Secretary, I maintain the
15 books and records for the legal entity.
16       Q     But you're not paid by SSC Equity
17 Holdings, are you?
18       A     No.
19       Q     Are you paid by Sava Senior Care
20 Administrative Services, LLC for the services you
21 perform on behalf of SSC Equity Holdings?
22       A     I believe so.
23       Q     And so would it be fair to say that to the
24 best of your knowledge that the activities of SSC
25 Equity Holdings are carried out through Sava Senior

Page 49

1  Care Administrative Services, LLC?
2        A     What activities?  The activities that I
3  perform for the company?
4        Q     Does it perform -- does SSC Equity
5  Holdings perform any activities that you don't
6  perform?
7        A     I don't know.  It's a holding company.
8        Q     Okay.  So do you know if it performs any
9  activities of any kind other than those you perform?
10       A     Not that I'm aware of.
11       Q     Do you know whether or not it files cost
12 reports for the State of South Carolina?
13       A     I believe it assists in the filing of the
14 cost report for SSC Seneca Operating Company.
15       Q     Do you know what a home office cost report
16 is?
17       A     I think it's the document that you file
18 with Medicare/Medicaid to be reimbursed for services.
19 That's my knowledge of a cost report.
20       Q     Do you know whether or not -- do you know
21 of your own knowledge whether or not SSC Equity
22 Holdings, LLC now files or has ever filed home office
23 cost reports with the State of South Carolina?
24       A     I am aware that SSC Equity Holdings, LLC
25 provides that service.  I don't know as direct

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                                    Pages 50..53

Page 50

1  knowledge whether it has done that for SSC Seneca
2  Operating Company, LLC.
3       Q    Ma'am, I'm not asking whether it does it
4  on behalf of SSC Seneca.  I'm asking whether or not
5  you have any knowledge as to whether or not SSC Equity
6  Holdings has filed cost reports, now or at any other
7  time, in and with the State of South Carolina?
8       A    I don't know.
9       Q    Do you know who Chris Stenger is?
10      A    I do.
11      Q    And who is he?  What is his role with Sava
12  Senior Care Administrative Services, LLC?
13      A    He is the Vice President of Reimbursement
14  and works in the Houston -- out of the Houston office.
15      Q    Are you aware that he has signed cost
16  reports under oath, home office cost reports, that
17  were filed on behalf of SSC Equity Holdings, LLC with
18  the State of South Carolina?
19           MR. OGLETREE:  Objection.
20           THE WITNESS:  No, I'm not aware of that.
21  BY MR. CONNOR:
22      Q    And are you aware of whether or not he has
23  done that while working for Sava Administrative
24  Services but acting as agent of SSC Equity Holdings,
25  LLC?

Page 51

1       A    No, sir.  I'm not familiar with that.
2       Q    So you didn't have any knowledge -- let me
3  ask you to assume that your testimony in this case has
4  been that Mr. Stenger has, in fact, signed under oath
5  cost reports, home office cost reports, on behalf of
6  SSC Equity Holdings, LLC while acting as its agent
7  through Sava Senior Care Services -- Administrative
8  Services -- just assume that to be the case?
9       A    Okay.
10      Q    Is it my understanding that you had no
11  knowledge of that when you filed this affidavit --
12      A    That's correct.
13      Q    -- in this case?
14      A    Yes, sir, that's correct.
15      Q    You had no knowledge of that?
16      A    No, sir, no knowledge.
17      Q    Do you know how many home office cost
18  reports have been filed with and in the State of South
19  Carolina on behalf of SSC Equity Holdings, LLC?
20      A    No, sir.
21      Q    Do you think that information would be
22  important to your understanding of the averments that
23  you made in your affidavit that you filed under oath
24  with the court in this proceeding?
25           MR. OGLETREE:  Objection.

Page 52

1           THE WITNESS:  I didn't say anything about
2       the cost reports and would not be able to answer
3       any questions about cost reports.
4  BY MR. CONNOR:
5       Q    So when you -- would it be fair to say
6  that with respect to the averments of your affidavit,
7  that they do not take into account the filing of any
8  cost reports with and in the State of South Carolina
9  by or on behalf of SSC Equity Holdings, LLC?
10      A    That is --
11           MR. OGLETREE:  Objection.  Go ahead.
12           THE WITNESS:  I agree with that, because I
13      have no knowledge of filing of cost reports.
14  BY MR. CONNOR:
15      Q    Do you know whether or not SSC Equity, LLC
16  has ever received a management fee in connection with
17  the operation of Seneca Health and Rehabilitation
18  Center?
19      A    Not that I'm aware of.
20      Q    Does that mean no, that you don't know or
21  no, it did not?
22      A    No, I don't know.
23      Q    Okay.  Do you know what representations
24  made have been made under oath by Mr. Stenger to the
25  State of South Carolina in that regard?

Page 53

1       A    No, I do not.
2       Q    So would it be fair to say that when you
3  filed your affidavit that you did not take into
4  account any activities that SSC Equity Holdings, LLC
5  may have had with the South Carolina -- with respect
6  to the filing of home office cost reports?
7           MR. OGLETREE:  Objection.
8           THE WITNESS:  Correct.
9  BY MR. CONNOR:
10      Q    Okay.  Bear with me just a -- Ms. Sims, do
11  you know what the term, "wrapper" means as it relates
12  to submissions to the patent office in connection with
13  applications for trademark or service mark protection?
14      A    No, I do not.
15      Q    And tell me, do you know of your own
16  knowledge what documents were filed by or on behalf of
17  Sava Senior Care Administrative Services in connection
18  with the application for trademark protection?
19      A    An application with the Patent and
20  Trademark office was filed, and there would have been
21  an example of how the mark was used, but I don't
22  recall what that example was.
23      Q    Would you have custody of the materials
24  that were filed with the patent office in connection
25  with that application?

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                              Pages 54..57

**Page 54**

1      A      I have a copy of the actual registration
2  that we received from the Patent and Trademark office.
3  Our outside counsel would have retained the actual
4  application for us.
5      Q      And who would that outside counsel have
6  been?
7      A      Duane Morris.
8      Q      With what firm?
9      A      That's the name of the firm, Duane Morris.
10  I don't recall the attorney.
11      Q      And do you know where that firm is based?
12      A      I work with their Atlanta office.
13      Q      Thank you.
14             Now, in connection with your role as
15  Senior Paralegal at Sava Administrative Services or in
16  connection with your role as an officer or Assistant
17  Secretary of any of these entities you've identified,
18  do you maintain or have custody of minutes of meetings
19  of the Board of Directors of the various LLCs that
20  we've discussed?
21      A      There are consent -- there are unanimous
22  written consents of the Board of Directors.  There are
23  no minutes of meetings that I'm aware of.
24      Q      Unanimous written consent about actions
25  taken by the LLC?

**Page 55**

1      A      Correct.  Like electing new officers --
2  those are generally the Board Consents maintained in
3  the records.
4      Q      You're not actually aware of any meetings
5  ever having occurred of the Board of Directors as
6  such, are you?
7      A      No, sir.
8             MR. OGLETREE:  Objection.  I'm sorry,
9       Mr. Connor, which entities are we talking about?
10             MR. CONNOR:  Any of the entities that she
11       serves as Corporate Secretary for.
12             MR. OGLETREE:  Okay.  Thank you.
13             THE WITNESS:  Yeah, I'm not aware of any
14       actual meetings.
15  BY MR. CONNOR:
16      Q      Okay.  And would you be familiar with or
17  have custody of minutes of any of the governing bodies
18  for any of the operating entities of the nursing home?
19      A      No, sir.
20      Q      Do you know who in 2010 constituted the
21  governing body for Seneca Health and Rehabilitation
22  Center?
23      A      I would know the positions.  I don't know
24  the titles -- I mean the names.  It would have been
25  the Administrator and the facility Vice President of

**Page 56**

1  Operations, but I don't know who the individuals were.
2      Q      Would that be true for all of the
3  operating entities?
4      A      Yes, sir.
5      Q      Okay.  So, for instance, Seneca Health and
6  Rehabilitation Center, the governing body, would be
7  comprised of the Administrator and the VP for
8  operations?
9      A      Correct.
10      Q      And would that be -- the same be true for
11  Sumpter East Health and Rehab Center in Sumpter, South
12  Carolina?
13             MR. OGLETREE:  Objection.
14             THE WITNESS:  Yes, sir.
15  BY MR. CONNOR:
16      Q      And so is it your position that SSC
17  Sumpter East Operating Center Company -- I'm sorry,
18  let me restate.
19             Is it your position that SSC Sumpter East
20  Operating Company, LLC actually has a Vice President
21  of Operations?
22             MR. OGLETREE:  Objection.
23             THE WITNESS:  Yes.
24  BY MR. CONNOR:
25      Q      And the same would be true for SSC Sumpter

**Page 57**

1  East Operating Company, LLC?
2             MR. OGLETREE:  Objection.
3             THE WITNESS:  I think that was the company
4       that you asked me about the first time.  I think
5       you asked me about Sumpter East both times.  Did
6       you mean Seneca?
7  BY MR. CONNOR:
8      Q      Thank you.  I did.
9             Is it fair to say that you understood that
10  the Seneca and Sumpter entities both have Vice
11  Presidents of Operations?
12      A      Yes, sir.
13      Q      And did have in 2010?
14      A      Yes, sir.
15      Q      And are you able to tell me whether or not
16  in 2010 those companies were part of a particular
17  region?
18             MR. OGLETREE:  Objection, form.
19             THE WITNESS:  Yes, but I don't know what
20       region they would be part of.
21  BY MR. CONNOR:
22      Q      Okay.  Do you know who the -- is there a
23  Regional President or a Regional Vice President?
24      A      Yes.
25      Q      Both or just one?

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                                    Pages 58..61

Page 58

1      A    There is a Regional President and a
2    Regional Vice President -- well, no.  There is a
3    Division President and a Regional Vice President.
4      Q    Okay.  A Division President, is that what
5    I understood you to say?
6      A    Yes, yes.
7      Q    And do you know who -- do you know who the
8    person would have been in 2010 for the Sumpter and
9    Seneca facility?
10     A    Paul Schrank.
11     Q    And who would have been the Regional Vice
12   President for that -- for the region that had
13   jurisdiction of those two facilities?
14     A    That I don't know.
15     Q    Okay.  Now, do you know whether or not any
16   Sava-related entity has entered into any kind of
17   Corporate Integrity Agreement with the U.S. Department
18   of Justice or the folks at --
19          MR. OGLETREE:  Objection.  Don't answer
20     that question.
21          MR. CONNOR:  I'm sorry?
22          MR. OGLETREE:  Don't answer that question.
23     Objection.
24          MR. CONNOR:  May I have the basis -- would
25     you state the basis for that objection?

Page 59

1          MR. OGLETREE:  This deposition was limited
2    to the personal jurisdiction issues relating to
3    SSC Equity Holdings and to Sava Senior Care,
4    LLC.  I don't understand what a Corporate
5    Integrity Agreement has to do with that at all.
6          MR. CONNOR:  Well, very simply, if you've
7    ever read the Corporate Integrity Agreements
8    that are typically entered into with these
9    entities, you'll know that they often indicate
10   that they'll take certain action at the facility
11   level to see that they're -- that the employees
12   there are trained in the terms of the Corporate
13   Integrity Agreement, and that they will assure
14   that the provisions of those agreements are
15   respected at the facility level, which I would
16   suggest they manage or control.  And so, Ben,
17   are you familiar with those agreements?  Have
18   you read those in the past?
19          MR. OGLETREE:  I'm not the one being
20     deposed here today.
21          MR. CONNOR:  Well, I'm simply stating the
22     basis for why I believe this question is
23     relevant.  You've objected on the grounds of
24     relevance, apparently, and don't feel it has any
25     relevance.  But I suggest that the nature of

Page 60

1    those agreements are such that the ones who
2    enter into those agreements do covenant with the
3    federal government to ensure that those
4    agreements are respected and carried out at the
5    facility level.
6          So I would pose my question again, having
7    made that representation to the witness.
8    BY MR. CONNOR:
9      Q    Ma'am, do you know whether or not Sava
10   Senior Care, LLC or any Sava-related entity has
11   entered into any form of Corporate Integrity Agreement
12   with the United States Department of Justice or any of
13   its agents -- or any of the agencies of the United
14   States?
15     A    No, I'm not aware of any agreement -- any
16   Corporate Integrity Agreement.
17     Q    If such agreement exists, would it be fair
18   to say that you're not the custodian of those
19   agreements?
20     A    That's correct.
21     Q    Okay.  Ma'am, are you the custodian of any
22   lease agreements that the operating entities have with
23   the owners of the real property upon which the nursing
24   home entities operate?
25     A    I have a copy of the leases.  I'm not the

Page 61

1    custodian of the original documents.
2      Q    Okay.  Now, how is it that a copy of those
3    agreements come into your custody?
4      A    I assist in maintaining a virtual data
5    room of documents, and the real property leases happen
6    to be one of the documents that's on that virtual data
7    -- in that virtual data room.
8      Q    Now, do you have the ability in your role,
9    if you wish to access information about the
10   deficiencies for which, say, the Seneca facility has
11   been cited in any given period of time, do you have
12   the ability to access that data?
13     A    Not personally.  I could -- if somebody
14   wanted it, I could ask someone in the regulatory
15   office for that, but it is not something that I
16   personally maintain or have direct access to.
17     Q    And by the regulatory office, then, you're
18   speaking of someone who would be working for Sava
19   Senior Care Consulting Service or Sava Consulting
20   Services?
21     A    Yes, sir, that's correct.
22     Q    And, likewise, do you have any access,
23   either directly or indirectly, for instance, to
24   information or data at a given facility such as Seneca
25   for things like (unintelligible), number of pressure

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
Wynn Sims on 12/07/2012                                    Pages 62..65

---

Page 62

1  ulcers, other clinical type of information?
2      A    I do not know.
3      Q    You do not or --
4      A    I do not have direct or indirect access to
5  that information.
6      Q    Okay.
7           MR. OGLETREE:  Let him finish asking the
8      question before --
9           THE WITNESS:  I'm sorry.
10          MR. OGLETREE:  It's okay.  Just let him
11     finish the question.
12 BY MR. CONNOR:
13     Q    Do you have custody of or have anything to
14 do with the policies or procedures that are in place
15 at any given Sava Operating subsidiary?
16     A    I -- there is someone in my office who I
17 can ask for that information.
18     Q    Who would you ask for that information?
19     A    Lisa Farve in the compliance office.
20     Q    Now, would she be associated with
21 consulting services or administrative services?
22     A    Administrative services.
23     Q    Okay.  Does the company have a -- is there
24 a system-wide intranet computer system for the Sava
25 entity?

Page 63

1      A    There is.
2      Q    And do you know what type of information
3  can be accessed on this system?  I'm not asking you
4  for specific information, but just generally the type
5  of information that can be accessed?
6      A    Yes, and it depends on what you do with
7  the company as to the level of your access on the
8  intranet.
9      Q    Are you able to produce reports from that
10 computer system?
11     A    No.
12     Q    You can communicate with the staff at the
13 Seneca facility via e-mail?
14     A    No.
15     Q    What about at the Sumpter facility?
16          MR. OGLETREE:  Objection.
17          THE WITNESS:  No.
18 BY MR. CONNOR:
19     Q    Have you had occasion to communicate with
20 folks at either of those facilities?
21     A    Not that I recall.
22          MR. OGLETREE:  Excuse me, Mr. Connor, do
23     you mean by e-mail or otherwise?
24          MR. CONNOR:  Otherwise.  She's told me she
25     hasn't communicated with them by e-mail.

Page 64

1           MR. OGLETREE:  Okay.  All right.
2           THE WITNESS:  Not that I have any
3      recollection, no.
4  BY MR. CONNOR:
5      Q    Ma'am, you're not a lawyer, are you?
6      A    No, I'm not.
7      Q    And tell me, please, what your educational
8  background is.
9      A    I graduated with a BA from Randolph Macon
10 Woman's College in Lynchburg, Virginia, and went to
11 the National Center for Paralegal Training here in
12 Atlanta, finished in the winter, 1986, and have been
13 employed as a paralegal since 1986.
14     Q    Okay.  Thank you.
15          Ma'am, when -- assuming that a facility
16 such as Seneca is cited for a violation of COBRA
17 regulation, is that something that you're made aware
18 of in your office?
19     A    I'm not, no.
20     Q    Do you know whether or not your boss is
21 made aware of those -- any such violation?
22     A    I don't know.
23          MR. CONNOR:  I'm about to wrap up, folks.
24     Can we take about a three-minute break so that I
25     can look at my notes and confer with my

Page 65

1  colleague?
2           MS. PROCTOR:  Absolutely.
3           MR. OGLETREE:  Yes, sir.  Mr. Connor, if
4      it's all right with you, can we take about five
5      minutes, five to ten?  We need to run a little
6      error here.
7           VIDEOGRAPHER:  The time is now 3:28 p.m.
8      We are now off the record.
9           (Whereupon, the proceedings were interrupted
10     by a short break.)
11          VIDEOGRAPHER:  The time is now 3:38 p.m.
12     We are now back on the record.
13          MR. CONNOR:  Are we ready to begin?
14          MR. OGLETREE:  Yes, sir.
15          MR. CONNOR:  Okay.  Thank you.  I'm sorry,
16     I couldn't tell.
17 BY MR. CONNOR:
18     Q    Ms. Sims, do you have any familiarity of
19 any kind with the litigation that has taken place in
20 New York that involved a Rubin Schron, Leonard
21 Grunstein, Murray Forman and various Sava entities?
22          MR. OGLETREE:  Objection.
23          THE WITNESS:  I am aware of it, but I'm
24     not very familiar with it.
25 BY MR. CONNOR:

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                                    Pages 66..69

Page 66

1       Q    How is it that you became aware of that
2  litigation?
3       A    I don't remember exactly.  I think someone
4  at the office mentioned it, and then someone forwarded
5  me the most recent decision out of New York, and I
6  read it -- I think it was posted on Google.  That's
7  the extent of my familiarity and awareness of the
8  matter.
9       Q    Okay.  Are you familiar with any of the
10 documents that were filed or received in evidence in
11 connection with that litigation?
12      A    No, sir.
13      Q    Does your office -- and by that I mean the
14 legal office for which you work -- do you know if it
15 maintained copies of any of the documents that were
16 generated in connection with that litigation?
17          MR. OGLETREE:  Object to the form.
18          THE WITNESS:  I believe Stefano Miele and
19      his assistant keep a file or docket or whatever,
20      but I've never seen that or discussed it with
21      him.
22 BY MR. CONNOR:
23      Q    All right.  So you're not directly
24 involved or related, then, in connection with that
25 litigation?

Page 67

1       A    No, sir.
2       Q    But your understanding is that Mr. Miele
3  has some kind of, at least, connection with -- in
4  terms of at least receiving information?
5          MR. OGLETREE:  Objection.
6  BY MR. CONNOR:
7       Q    And who would be his -- am I correct in
8  that regard?  Is your understanding that Mr. Miele
9  received some information about that litigation or has
10 received over the course of time --
11          MR. OGLETREE:  Objection.
12 BY MR. CONNOR:
13      Q    -- some information about it?
14      A    I believe so.  I think that either Sava
15 Senior Care, LLC or Sava Senior Care Administrative
16 Services, LLC was sued by Mr. Schron and Stefano is
17 the general counsel of both of those companies, so
18 that's why I think he would be aware of some of the
19 documents.
20      Q    Okay.  But do you know what kinds of
21 documents he's received, whether they be pleadings or
22 exhibits or anything like that?
23          MR. OGLETREE:  Objection.
24          THE WITNESS:  I'm sorry, yeah, I don't
25      know.

Page 68

1  BY MR. CONNOR:
2       Q    Who would be his assistant that assists
3  him in that regard?
4          MR. OGLETREE:  Objection.
5          THE WITNESS:  His executive assistant is
6      Melita Hobby.
7  BY MR. CONNOR:
8       Q    Would you spell her name for me, please?
9       A    M-E-L-I-T-A, H-O-B-B-Y.
10      Q    Thank you.
11           Have you ever had occasion to meet Leonard
12 Grunstein?
13      A    I met him one time in January, 2005.
14      Q    Have you ever worked with him in any role?
15      A    No.
16      Q    Have you ever known him to perform
17 services on behalf of Sava Senior Care, LLC?
18      A    No.
19      Q    Have you ever met or worked with Murray
20 Forman?
21      A    I met Murray in January, 2005, also, and I
22 believe he was in our office five or six years ago,
23 and I saw him walk down the hallway.
24      Q    Have you ever performed any services for
25 him?

Page 69

1       A    No, I have not.
2       Q    Are you aware that Sava Administrative
3  Services, LLC has acted in various capacities as agent
4  or on behalf of SSC Equity Holdings, LLC?
5       A    No.
6       Q    Have you ever seen the cost reports, the
7  home office cost reports, that have been generated on
8  behalf of SSC Equity Holdings, LLC?
9       A    No, I have not.
10      Q    So you've -- so have you ever seen -- have
11 you ever seen any documents in which Chris Stenger
12 purported to act on behalf of SSC Equity Holdings,
13 LLC?
14      A    No, sir.
15      Q    Okay.  Are you -- do you have access to
16 the Revolving Credit Agreement that is now or in the
17 past has been in existence with respect to Sava Senior
18 Care, LLC?
19          MR. OGLETREE:  Objection.
20          THE WITNESS:  I do, I have a copy of it.
21 BY MR. CONNOR:
22      Q    And are you familiar with it?  Have you
23 ever read it?
24      A    I have -- I read it, like proofreading a
25 document back in 2005, but I don't understand what's

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                                    Pages 70..73

---

Page 70

1  in it.
2       Q     I understand that.  So you read it for
3  grammatical and punctuation and things like that?
4       A     Yes, sir.
5       Q     Okay.  And in that -- do you know whether
6  or not SS -- do you know whether or not -- let me get
7  the name right.
8             Do you know whether or not SSC Seneca
9  Operating, LLC is a party to that Revolving Credit
10 Agreement?
11      A     It is, it's a borrower under the
12 agreement.
13      Q     And is it your understanding from your
14 review of that agreement that it's liable for the
15 obligations thereunder?
16            MR. OGLETREE:  Objection.
17            THE WITNESS:  I don't know that.
18 BY MR. CONNOR:
19      Q     Do you know whether or not its assets are
20 pledged as security for that agreement?
21      A     Assets, I believe so.
22      Q     Do you know whether or not it's defined as
23 an affiliate or identified as an affiliate of Sava
24 Senior Care, LLC under that agreement?
25      A     I don't know.

Page 71

1       Q     Do you know whether or not the term,
2  "affiliate" is defined in that agreement?
3       A     I don't recall.
4       Q     Do you know whether or not that agreement
5  contains requirements for minimum occupancy levels of
6  either the Seneca facility or the facilities that's
7  aggregate that operate nursing homes under the Sava
8  umbrella?
9       A     I don't know.
10      Q     How is it that you came -- do you maintain
11 a copy of that agreement in your offices?
12      A     Yes.
13      Q     Okay.  And would that have come to you
14 through Mr. Miele?
15      A     Yes.
16      Q     Okay.  Do you know whether or not -- do
17 you know whether or not Leonard Grunstein is the
18 signatory to that agreement?
19      A     I believe Canyon Sudar Partners is, but I
20 don't know about Len, individually, no.
21      Q     Okay.  Do you know -- did he, to your
22 knowledge, sign on behalf of Canyon Sudar?
23      A     I believe so.
24      Q     Okay.  Do you know whether or not either
25 he or Murray Forman signed on behalf of Sava Senior

Page 72

1  Care, LLC?
2       A     I don't know.
3       Q     Do you know whether any representative of
4  Seneca Health and Rehabilitation Center signed that
5  document?
6       A     The President of SSC Seneca Operating
7  Company, LLC signed the document.
8       Q     Okay.  And would have signed with the
9  Seneca being a party to the agreement?
10      A     Yes, being a borrower under the agreement,
11 yes.
12      Q     And would, likewise, SSC Sumpter East
13 Operating Company, LLC have signed on as an obligor
14 under that agreement?
15      A     Yes, also as a borrower.
16      Q     And would Mr. Schrank have signed in his
17 representative capacity on behalf of that entity?
18      A     I don't recall 100 percent if he was the
19 President of the -- those two operating companies in
20 2005.  I believe that he was.
21      Q     In any event, would it be your
22 recollection, regardless of who it was that signed it,
23 that the President and CEO of -- I'm going to use
24 shorthand, Seneca and Sumpter, would have signed in a
25 representative capacity on behalf of the obligors?

Page 73

1       A     Correct, yes.
2       Q     Okay.  Are you aware of any other
3  contracts that Mr. Grunstein may have signed, apart
4  from -- that is different from and other than the
5  Revolving Credit Agreement --
6             MR. OGLETREE:  Objection -- I'm sorry.
7             MR. CONNOR:  -- that would have acted --
8  Seneca -- excuse me, SSC Seneca Operating
9  Company, LLC?
10            MR. OGLETREE:  Objection.
11            THE WITNESS:  Not that I'm aware of, no.
12 BY MR. CONNOR:
13      Q     Or that would have affected SSC Sumpter
14 East Operating Company, LLC?
15            MR. OGLETREE:  Objection.
16            THE WITNESS:  I'm not aware of any, no.
17 BY MR. CONNOR:
18      Q     Same question as it relates to Mr. Forman
19 in any capacity.  Are you aware of any agreements he
20 signed that would have affected either of those
21 facilities?
22            MR. OGLETREE:  Objection.
23            THE WITNESS:  No, I'm not.
24 BY MR. CONNOR:
25      Q     How many times have you been deposed in

---

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                                    Pages 74..77

**Page 74**

1    your capacity as Corporate Secretary for any of the
2    entities that we've talked about?
3         A    Ten or 11 times, I think.
4         Q    And in how many cases have you filed
5    affidavits --
6              MR. OGLETREE:  Mr. Connor, would you
7         please repeat the question?  The court reporter
8         is having trouble hearing the last little part
9         there at the end.
10             MR. CONNOR:  I apologize for that.
11   BY MR. CONNOR:
12        Q    How many times, ma'am, would you have
13   signed affidavits in support of Motions to Dismiss For
14   Lack of Personal Jurisdiction on behalf of any Sava
15   entity?
16        A    I do not recall a number, more than ten.
17             MR. CONNOR:  Okay.  I think those are all
18        the questions I have.  Unless my colleague wants
19        to talk?
20             MR. MULLMAN:  I don't have anything,
21        thanks.
22             MR. CONNOR:  Okay.  Ma'am, those are all
23        the questions I have.  I appreciate, very much,
24        your time.  I'll let your counsel, Mr. Ogletree,
25        explain your rights as they relate to reading.

**Page 75**

1              MR. OGLETREE:  I have a few follow-up
2         questions, but they won't take very long.
3              MR. CONNOR:  Fair enough.
4              MR. OGLETREE:  Ms. Sims -- I'm sorry,
5         Mr. Connor, but the videographer is just asking
6         me to clip the microphone onto my shirt here.
7              MR. CONNOR:  Not a problem.
8              MR. OGLETREE:  Is that better?  Can you
9         hear?
10             VIDEOGRAPHER:  (Nods head affirmatively.)
11                      EXAMINATION
12   BY MR. OGLETREE:
13        Q    Earlier this afternoon you were asked
14   questions about receiving and opening of mail when it
15   arrives in the office.  If mail --
16             MR. CONNOR:  I'm sorry, I can't hear you.
17             MR. OGLETREE:  I'm sorry.
18   BY MR. OGLETREE:
19        Q    Earlier this afternoon you were asked some
20   questions about when mail is received on behalf of SSC
21   Equity Holdings and Sava Senior Care, LLC at the
22   office, and it comes to you, you indicated that you
23   opened that mail; is that correct?
24        A    Normally the only mail I'm delivered for
25   those companies comes from the Secretary of State's

**Page 76**

1    Office.  Our mail room knows to deliver that type of
2    mail to me.
3         Q    When you open that mail --
4         A    Yes.
5         Q    -- are you doing that in your capacity as
6    the -- as an officer or the Corporate Secretary of
7    those entities?
8         A    Yes.
9         Q    Were you also asked some questions today
10   about the Regional VP, Vice President and Divisional
11   President.
12        A    Okay.
13        Q    I want to clarify what those roles are
14   that we're mentioning.  When you refer to Division
15   President, Division President of what, what entity?
16        A    Well, there are two divisions.  There is
17   an East Division and a West Division.
18        Q    Under which company?
19        A    Under -- for the SSC Operating companies
20   that fall into a designated Eastern Division, then
21   Paul Schrank is the Division President East, and for
22   those SSC Operating companies that are in a Western
23   Division, it's just delineated --
24        Q    I see.
25        A    In the country, East and West.

**Page 77**

1         Q    Okay.
2         A    And then within those divisions there are
3    regions.  I don't know what all these regions are off
4    the top of my head -- delineated regions, and then
5    those regions have officers like a Vice President, a
6    Regional Vice President and clinical directors and
7    other offices.
8         Q    Now, you're referring to the operating
9    companies?
10        A    No.
11        Q    What are you referring to?  Is it Sava
12   Administrative --
13        A    No, Sava Senior Care Consulting.
14        Q    Consulting.
15        A    Right.
16        Q    So when we refer to the regions, they are
17   regions within the construct of Sava Consulting?
18        A    Yes.
19        Q    And that is -- when you were talking about
20   Paul Schrank being the Division President --
21        A    Correct.
22        Q    -- you mean in his role as Division
23   President under the rubric of Sava Consulting?
24             MR. CONNOR:  Object to form.
25             THE WITNESS:  His title -- his title for

**Russell A. Reynolds, III, et al. vs. Sava Senior Care, LLC, et al.**
**Wynn Sims on 12/07/2012**                                    **Pages 78..81**

---

**Page 78**

```
 1        Sava Senior Care Consulting is Division
 2     President, but he is the President of SSC Seneca
 3     Operating Company, LLC.
 4  BY MR. OGLETREE:
 5        Q     So is it correct to say, then, he is
 6  wearing two hats, right?
 7        A     Yes.
 8        Q     Okay.  To your knowledge, those are
 9  independent roles he is playing, his role at the
10  facility and his role with the consulting?
11        A     Correct.
12            MR. CONNOR:  Objection, form.
13            MR. OGLETREE:  I have no further
14  questions.
15            MR. CONNOR:  Anyone else have questions?
16            MS. MILLER:  No.
17            MS. CULBREATH:  No.
18            MR. CONNOR:  There being none, I have no
19  further questions.  And Ben, do you want to
20  explain reading and signing?
21            MR. OGLETREE:  You're going to have an
22  opportunity to review and sign the transcript.
23  There will be a copy made, you'll have a chance
24  to review it and make any corrections to it that
25  you would deem appropriate, and you will have to
```

**Page 79**

```
 1  sign, verifying that that's what you are doing,
 2  and we will circulate those changes to everyone
 3  else.
 4            THE WITNESS:  Okay.
 5            MR. OGLETREE:  But you have the -- the
 6  general gist of it is you have the chance to
 7  review and make any edits that you want to.
 8            THE WITNESS:  Okay.  Thank you.
 9            MR. CONNOR:  And I'm sorry, I couldn't
10  hear.  Did she elect to read and sign or to
11  waive?
12            MR. OGLETREE:  She'd like to read, please,
13  read and sign.
14            MR. CONNOR:  Okay.  And then Ray, do you
15  think we need to ask for any kind of expedited
16  transcript as it relates to our hearing on
17  Monday?
18            MR. MULLMAN:  I doubt it will even get
19  there with expedited.  I don't think we need it.
20            MR. CONNOR:  That's fine, and I didn't
21  think so, either, but I'd sure hate to keep our
22  court reporter up.
23            MS. PROCTOR:  Just FYI, Ken, the court
24  reporter is nodding that she can have it if you
25  need it, but you can't see that, so I'm telling
```

**Page 80**

```
 1  you.
 2            MR. MULLMAN:  Thank you, Lori.  I don't
 3  think we need it.  I think we can file it -- I
 4  don't think this will be much an issue that we
 5  can't agree on, you know.  We can file it
 6  subsequently.
 7            VIDEOGRAPHER:  This is the end of Disk
 8  Number 1 of the deposition of Wynn Sims.  The
 9  time is 3:57 p.m., and we are now off the
10  record.
11
12  (Whereupon the deposition was concluded at 4:00 p.m.)
13
```

**Page 81**

```
                    ERRATA SHEET
 1  I do hereby certify that I have read all questions
 2  propounded to me and all answers given by me on the
 3  7th day of December, 2012, taken before Whitney S.
 4  Guynes, and that:
 5
 6        _____  1)  There are no changes noted.
 7               2)  The following changes are noted:
 8
 9        Pursuant to Rule 30(7) (e) of the Federal Rules
10  of Civil Procedure and/or the Official Code of Georgia
    Annotated 9-11-30 (e), both of which read in part:
    Any changes in form or substance which you desire to
11  make shall be entered upon the deposition... with a
    statement of the reasons given... for making them.
12  Accordingly, to assist you in effecting corrections,
    please use the form below:
13
14  Page No. _____ Line No._____  Should read:_____
15  _____
    And the reason for the change is:_____
16  Page No. _____ Line No._____  Should read:_____
    And the reason for the change is:_____
18
    Page No. _____ Line No._____  Should read:_____
19
20  And the reason for the change is:_____
    Page No. _____ Line No._____  Should read:_____
21
22  And the reason for the change is:_____
23  And the reason for the change is:_____
24
25
```